**CHICAGO, MILWAUKEE, ST. PAUL
AND PACIFIC RAILROAD
COMPANY**

v.

**The UNITED STATES.**

No. 553–58.

United States Court of Claims.

Dec. 13, 1968.

Gerald J. O'Rourke, Jr., Washington, D. C., for plaintiff, Robert T. Molloy, Washington, D. C., attorney of record, Robert E. Simpson, Washington, D. C., of counsel.

Knox Bemis, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Chief Trial Commissioner Marion T. Bennett, with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The commissioner has done so in an opinion and report filed on March 28, 1968. Each of the parties has excepted to the opinion, findings and recommendations of the trial commissioner in certain respects.* The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover (1) with respect to the Mexican tax credit issue and (2) with respect to the bond discount issue, in part, but that with respect to the remaining issues

plaintiff is not entitled to recover and to such extent the petition is dismissed. Judgment is entered for plaintiff accordingly on the two issues referred to above with the amount of recovery to be determined pursuant to Rule 47(c).

NICHOLS, Judge, concurs in the result as to the "Depreciation Issue" and otherwise joins in the Per Curiam opinion of the court.

### OPINION OF COMMISSIONER

BENNETT, Chief Commissioner:

Plaintiff taxpayer is a railroad corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Chicago, Illinois. Taxpayer at all times here pertinent engaged in the business of operating as a common carrier by railroad in interstate, intrastate, and foreign commerce. For the years in question, taxpayer has computed its income and filed its federal income tax returns on the accrual basis of accounting.

This cause of action was brought to recover federal income taxes in the amount of $14,437,951.31 paid by the taxpayer, plus deficiency interest and statutory interest on all such sums. This suit arose out of a recomputation by the Commissioner of Internal Revenue of the taxpayer's federal income tax liability for the years 1942 through 1951.

As a result of pretrial agreements and appropriately filed stipulations between the parties hereto, only the following four issues remain in this proceeding for consideration by the court: (1) deductions for discount and expense attributable to old bonds exchanged for

---

* Taxpayer excepts to (1) that part of the trial commissioner's discussion and recommendation on the "Old Bond Discount and Expense Issue" which rejects the taxpayer's claims; (2) the rejection of the claim on the "Documentary Stamp Issue"; and (3) the rejection of the claim on the "Depreciation Issue." The defendant's only exception is to that part of the recommen-

dation on the "Old Bond Discount and Expense Issue" which rejects the Government's contention that old bond and expense deductions should be disallowed for the first eleven months of 1945. Neither party excepts in any way to the recommended disposition of the "Mexican Income Tax Credit Issue."

new securities and stock in a section 77 Federal Bankruptcy Act reorganization, 49 Stat. 911 (1935), as amended by 49 Stat. 1969 (1936), 53 Stat. 1406 (1939), 11 U.S.C. § 205 (1964); there is also involved the question of deductions for unamortized expense on new bonds reacquired; (2) deductions for the purchase and cancellation of documentary stamps placed by taxpayer upon stock certificates transferred from a voting trust upon termination of such trust; (3) deductions for depreciation computed by application of "whole-life" depreciation rates; and (4) a set-off claim raised by the Government relating to the amount of Mexican income tax foreign tax credit to be applied as a reduction of taxpayer's United States income tax liability for the years 1942 through 1951.

The necessary facts to lend clarity and continuity to the presentation are set forth in the discussion of each issue. Counsel have submitted extraordinarily excellent briefs. Acknowledgment is made of extensive use of their statements, to the extent that they coincide with the views set forth here on the evidence and the law.

### Old Bond Discount and Expense Issue

By court order dated November 26, 1945, taxpayer was reorganized, effective December 1, 1945, under section 77 of the Bankruptcy Act, supra. Although taxpayer existed as the same corporation after the reorganization, its entire capital structure was revised. The taxpayer's old common and preferred stock issues were eliminated entirely, and all of the taxpayer's old bonds were exchanged for new securities. Certain bond issues (including all five series of old general mortgage bonds involved in this case) were exchanged for a combination of cash and new bonds with different interest rates, maturity dates, security provisions, and conditions of payment. Another old bond issue (the old 50-year, 5-percent mortgage bond issue involved in this case) was exchanged for a combination of cash, new

bonds, and new preferred stock. The remaining old bond issues (including the old convertible adjustment 5-percent bonds involved in this case) were exchanged solely for new stock, either common (as in the case of the old convertible adjustment 5-percent bonds) or preferred. A substantial amount of taxpayer's old debt was thus extinguished as debt, being exchanged for common and preferred stock.

The five series of old general mortgage bonds had been issued at discounts and there were certain issuance expenses. There had been no discount on the old 50-year, 5-percent mortgage bonds, but there had been some issuance expense. Similarly, there had been no discount on the old convertible adjustment 5-percent bonds, but there had been expenses attributable to their issuance. In reliance upon the assumption that the taxpayer would be required to pay at the bonds' maturities the excess of the par value of the bonds over the capital raised through their issuance, the taxpayer had been allowed to amortize the discount and expense on the various bond issues over the number of years remaining to their respective maturity dates. Consequently, as of the effective date of the reorganization, there remained unamortized bond discount and issuance expenses related to the various old bond issues.

The arguments of the taxpayer relating to the treatment of old bond discount and expense not amortized before December 31, 1944, and the Government's position on each argument is accurately summarized in defendant's brief, essentially as follows:

(1) Taxpayer seeks deductions in 1945 based upon the amortization of old bond discount and expense at the rates applicable under the old maturity dates, up until December 1, 1945. The Government's position is that taxpayer is entitled to deductions for that amortization allowable on the new bonds, not the old bonds, for the first 11 months of 1945, because during 1945 the new bonds were substituted for the old.

(2) Taxpayer seeks to carry over the amount of discount and expense relating to the old general mortgage bonds and remaining unamortized on December 1, 1945, to the new bonds issued in exchange for them, to be amortized over the lives of the new bonds. The Government concedes that a carryover is to be permitted, but asserts that the carryover allowable is of the amount remaining unamortized as of January 1, 1945, consistent with its position that amortization is not to be allowed at the old bond rates for the first 11 months of 1945.

(3) Taxpayer seeks to carry over a portion (approximately 15 percent) of the amount of the expense relating to the issuance of the old 50-year, 5-percent mortgage bonds and remaining unamortized on December 1, 1945, to new bonds issued partially in exchange for them. The Government's position is that no carryover of expense on these bonds is allowable.

(4) Taxpayer seeks to deduct in 1945 the remaining unamortized portion as of December 1, 1945 (approximately 85 percent) of the amount of the expense relating to the issuance of the old 50-year, 5-percent mortgage bonds, and remaining unamortized on December 1, 1945, and to deduct, also in 1945, the remaining amount of unamortized expense relating to the issuance of the old convertible adjustment mortgage bonds. The Government's position is that such deductions are not allowable.

(5) The taxpayer seeks to deduct, in the years in which it reacquired certain of its new bonds at par or above, the unamortized discount and expense carried over from the old bonds and remaining unamortized on the dates of acquisition. The Government concedes that this is proper treatment, but only as to the amounts of discount and expense properly carried over to new bonds. Specifically, it is said that no deduction should be allowed on account of any expense related to the issuance of the old 50-year, 5-percent mortgage bonds, because such

expense is not properly to be carried over to the new bonds at all.

(6) Taxpayer seeks to deduct, in the year in which it acquired certain of its new bonds at a discount, the expense carried over from the old bonds (plus the expense of issuance of the new bonds) remaining unamortized on the dates of acquisition. The Government's position is that such deductions are not allowable.

The first argument centers around the question as to what date should amortization of bond discount and expense at the old rates cease and the new rates begin, where such amortization is otherwise allowable. As recited in the findings of fact, the taxpayer was reorganized, effective December 1, 1945, and upon reorganization the exchange of old securities for new took place.

In Great Western Power Co. v. Commissioner, 297 U.S. 543, 56 S.Ct. 576, 80 L.Ed. 853 (1936), correctly characterized by plaintiff as a landmark decision, the bonds of a corporation sold at a discount were retired by exchanging for them bonds of another issue and payment of a premium. At the date of exchange there remained unamortized discount and expense with respect to the old bonds. The Court held that with respect to the remaining unamortized discount and expense, it should be carried over and amortized over the life of the new bonds. The Court stated at page 546 (56 S.Ct. 576, 577,) of the opinion:

The question then is whether, upon an exchange of one obligation for another which is to be retired, the transaction is to be viewed as if the retirement were accomplished by the payment of cash. If the retired bonds had not been called, the expense items incurred in connection with their issuance would properly be amortized over the remainder of their life. Here the petitioner substituted a new obligation for the old. The remaining unamortized expenses of issue of the original bonds and the expense of the exchange are both expenses attributable to the issuance of the new bonds and should be treated as a part of the

cost of obtaining the loan. *They should, accordingly, be amortized annually throughout the term of the bonds delivered in exchange for those retired.* [Emphasis supplied.]

In I.T. 3635, 1944 Cum.Bull. 101, the taxpayer railroad filed a bankruptcy petition in the United States District Court in 1935 desiring to effect a reorganization under section 77 of the Bankruptcy Act, supra. The petition was approved, and in 1940 the District Court approved the plan of reorganization which was to be effective as of January 1, 1939. Under the plan, the old securities were to be exchanged for new securities. However, litigation with respect to the plan ensued and as of the date of I.T. 3635 the plan had not yet become operative. The question then arose as to the deductibility of the interest accruing on the old obligations for the years 1939 and 1940. The court answered this question as follows (I.T. 3635 at 102):

> It is held that the interest on the obligations of the M Railroad Co. *continues to accrue as a deduction until the date of the transfer of the corporate assets to the reorganized corporation,* since (1) *the obligation to pay interest runs until the debt is extinguished by the exchange of the obligations of the debtor corporation for obligations of the reorganized corporation,* * * *. [Emphasis supplied.]

On the basis of the above examples it would appear that as long as the old bonds retain vitality and until the new bonds come into existence the amortization of discount and expense should continue at the old rate.

The Government, however, maintains that December 31, 1944, should be the cutoff date and that as of January 1, 1945, any allowable carryover of unamortized bond discount and expense should be amortized over the life of the new indebtedness. The Government cites for this proposition a number of cases all involving situations where the indebtedness was cancelled entirely with-

in the taxable year and *in no sense was there a substituted indebtedness of any form.* In such cases at the end of the taxable year there would be no liability remaining and nothing on which interest could accrue, nor was there any payment or liability to pay any interest as of the end of the taxable year. See, e. g., McConway & Torley Corp., 2 T.C. 593 (1943); Towers & Sullivan Mfg. Co., 25 B.T.A. 922 (1932).

In the case before this court a new obligation was substituted for the old and in a similar circumstance the Supreme Court held that the old bond unamortized discount and expense should be "amortized annually *throughout the term* of the bonds delivered in exchange * * *." Great Western Power Co. v. Commissioner, supra at 547, 56 S.Ct. at 577. (emphasis supplied).

The above case, when viewed with I.T. 3635, supra, which stated that the interest accrues as a deduction until the date of the exchange of obligations, would indicate that December 1, 1945, is the date at which the old rate gives way to the new.

The second argument is resolved by a correct concession on the part of the Government and the result with respect to the first argument. As to the unamortized bond discount and expense relating to the old general mortgage bonds as of December 1, 1945, these amounts are properly carried over to the new bonds issued in exchange for them, to be amortized over the life of the new bonds. Great Western Power Co. v. Commissioner, supra. The Government concedes that the carryover is allowable but argues that the carryover is of the amount remaining unamortized as of January 1, 1945. This contention is disposed of by the resolution of the first argument which determined that the proper date was December 1, 1945, and not January 1 of the same year.

Arguments three and four center around the old 50-year, 5-percent mortgage bond issue which was exchanged for a combination of cash, new bonds, and new preferred stock and the old con-

vertible adjustment 5-percent bonds exchanged for common stock. As to the percentage of the 50-year, 5-percent bonds exchanged for stock and the convertible adjustment 5-percent bonds exchanged for stock, the taxpayer would like to deduct those unamortized issuance expenses relating to those bonds. As to the percentage of the 50-year, 5-percent bonds exchanged for new bonds, the taxpayer would like to carry over the unamortized discount and issuance expense to the new bonds. The Government's answer to both contentions is negative.

■ The expense of bond issuance is treated for tax purposes essentially the same as discount; that is, the amount is properly chargeable against capital as a reduction in the amount of the proceeds realized by the taxpayer from the bond issue. Helvering v. Union Pac. R. R., 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 (1934). In the case cited, the Court gave a full discussion at pages 286–87, 55 S.Ct. at pages 167–168 to the nature of bond issuance expense and the appropriate tax treatment of it, in pertinent part as follows:

Both commissions and discount, as the Government concedes, are factors in arriving at the actual amount of interest paid for the use of capital procured by a bond issue. The difference between the capital realized by the issue and par value, which is to be paid at maturity, must be added to the aggregate coupon payments in order to arrive at the total interest paid. Both discount and commissions are included in this difference. If the difference be viewed as a loss resulting from the funding operation, it is one which is realized only upon the payment of the bonds at maturity.

But even if the commissions, unlike discount, may, as the Government insists, be regarded as a contemporary expense of procuring capital, it is one properly chargeable to capital account. In practice it is taken out of the proceeds of the bonds by the banker. But in any case it must be deducted from the selling price to arrive at the capital realized by the taxpayer from the sale of the bonds, in return for which he must, at maturity, pay the face value of the bonds. The effect of the transaction in reducing the capital realized, whether through the payment of commissions or the allowance of discount, is the same. In this respect the commissions do not differ from brokerage commissions paid upon the purchase or sale of property. The regulations have consistently treated such commissions, not as items of current expense, but as additions to the cost of the property or deductions from the proceeds of sale, in arriving at net capital profit or loss for purposes of computing the tax.

Here the commissions, when paid, were properly chargeable against capital, and reduced by their amount the capital realized by the taxpayer from the bond issue. They come out of the pocket of the taxpayer only on payment of the bonds at maturity. But, unlike the purchase and sale of property, the transaction contemplated from the beginning a fixed date, the due date of the bonds, at which the difference between the net amount of capital realized upon the issue and the par value of the bonds must be paid to bondholders by the taxpayer. We think that the revenue acts, as they have been interpreted by this Court and the treasury regulations upon this and related subjects, require that this difference between receipts and disbursements of the taxpayer should, in some form, enter into the computation of his taxable income. It is a loss to the taxpayer, definite as to its date and amount, and represents a part of the cost of the borrowed capital during each year of the life of the bond issue. Cf. United States v. Anderson, supra, [269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347]. At least where the taxpayer's books are kept upon the accrual basis, its final disbursement may be anticipated by amortization and the amortized amount deducted annually

from his gross income. [Footnote omitted.]

The *Union Pacific* decision, supra, pointed out at page 287, 55 S.Ct. at page 168 that bond issuance costs are not business expenses in the year the bonds are issued: "They come out of the pocket of the taxpayer only on payment of the bonds at maturity." However, deductions are allowable to the taxpayer based upon the amortization of the expense (like the discount) over the life of the bonds. This does not represent the postponement, for tax purposes, of an expense already paid out. Instead, it represents the anticipation of an expense that does not come out of the taxpayer's pocket until the debt is paid off at maturity, but which can be deducted on a prorated annual basis over the life of the bond as a cost of producing income in each year. Accordingly, the taxpayer's right to a deduction representing amortization of bond issue expense depends upon the existence of an obligation requiring that the taxpayer pay off at a fixed future date an amount in excess of the net proceeds of the bond issue.

In 1945, taxpayer's obligation on each old 50-year, 5-percent mortgage bond was modified, pursuant to its bankruptcy reorganization, so that taxpayer was no longer obligated to repay at a fixed future date an amount in excess of the proceeds of the issuance of each bond. On December 1, 1945, the holder of each old $1,000 par, 50-year, 5-percent bond received in exchange for his bond and its accrued interest the following: $225.78 in cash; $182.05 par value of new convertible series B income bonds due to mature January 1, 2044; and $1,013.78 par value, 5-percent preferred stock. The preferred stock had no maturity date; thus, after the reorganization, each old 50-year, 5-percent bond was represented, not by an obligation to pay $1,000, but by an obligation to pay $182.05, because the balance of the old debt had been transformed into preferred stock.

The substitution of preferred stock for a debt means that the principal of the debt is no longer required to be paid at a fixed future date. For this reason, the discount and expense attributable to the issuance of the debt for which the stock is substituted are not deductible once the substitution is made. Liquid Carbonic Corp., 34 B.T.A. 1191, 1196–97 (1936); Chicago, R.I. & Pac. Ry. v. Commissioner, 47 F.2d 990 (7th Cir. 1931), cert. denied, 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527.

There is no justification for taxpayer's attempted allocation of a portion of the expenses of the old 50-year, 5-percent mortgage bonds to the new bonds issued partially in exchange for them. For each old $1,000 par value bond, the bondholder was given a new bond with a par value of only $182.05. Thus, the amount required to be paid off at maturity on each new bond was less than 20 percent of the amount to be paid off at the maturity of each old bond. Even taking the 1945 cash payment into consideration, the amount that taxpayer had paid, or was obligated to pay at a fixed future date, was substantially less than the amount of capital originally raised by issuing the old bonds. Because taxpayer was relieved of the requirement of paying out in the future more than its net proceeds from the issuance of the bonds, there is no longer any reason to allow taxpayer an amortization deduction. There is nothing left to amortize.

Consequently, taxpayer is not entitled to any deduction after December 1, 1945, on account of the issue expense of the old 50-year, 5-percent mortgage bonds, because the taxpayer is not required to pay off any amount in excess of the capital raised through their issuance.

As to the fifth argument, the taxpayer is correct in its position that it is entitled to a deduction for unamortized old bond discount and expense properly carried over to the new bonds in the years in which the new bonds were retired at, or in excess of, their par

value.[1] The reason is that by paying off the new bonds at par, taxpayer expended an amount in excess of the proceeds of issuance of the bonds at least equal to the amount that it had been amortizing over the life of the bonds. Redemption of the bonds at par resulted in payment of the discount and expense in advance of the bonds' maturities, the date of payment anticipated by the amortization.

Finally, the taxpayer also seeks to apply the same considerations to those bonds redeemed at a discount. However, the same considerations do not apply. There is no showing that the taxpayer paid at redemption any amount in excess of the capital raised upon issuance of the old bonds. The taxpayer did elect the benefits of section 22(b) (9) of the Internal Revenue Code of 1939, added by ch. 247, § 215, 53 Stat. 875, which allows the exclusion of income otherwise resulting from the redemption of bonds at a discount. Section 22(b) (9) requires the disallowance of the deduction for unamortized discount upon any bond for which the taxpayer elects to exclude income. Taxpayer argues that because section 22(b) (9) does not include the word "expense" the unamortized expense on the bonds redeemed may still be deducted, even though no income is recognized from the discharge of the debt.

This position is incorrect. Although section 22(b) (9) does not include the word "expense," it does disallow any deduction for discount attributable to the debt discharged. Therefore, since the expense of bond issuance is regarded as having essentially the same nature and effect as bond discount, Helvering v. Union Pac. R. R., supra, section 22(b) (9) should be construed to include issuance expense as well as discount.

■ Even apart from the restrictions of section 22(b) (9), taxpayer is not entitled to any deductions for the issuance expenses of bonds retired at discounts. There is nothing to show that such expenses were ever paid, though incurred. *Union Pacific*, supra, recognized that the expenses of issuance do not come of the issuer's pocket until the bonds are paid off at par at maturity. Instead of paying these bonds at par, taxpayer redeemed them at a discount. There is nothing to show that taxpayer ever paid out any amount in excess of the net proceeds of the issuance of the bonds. Without a showing of payment, there is no deduction allowable for expense.

*Documentary Stamp Issue*

Stipulated facts in this proceeding disclose that plaintiff, on or about December 1, 1945, executed and became a party to a voting trust agreement. On December 1, 1950, 5 years after the effective date of plaintiff's reorganization, the voting trust was terminated. At that time plaintiff caused certain shares of stock, which had been held by the trustees, to be transferred to the holders of the voting trust certificates. To effectuate this transfer, plaintiff purchased and cancelled federal documentary stamps in 1950 and in 1951 in the respective amounts of $112,104.40 and $38,500.65.

Upon audit of plaintiff's returns for these years, the deduction for the cost of such stamps was denied by the Commissioner on the grounds that such expense was a reorganization expense and, therefore, not deductible. It is the plaintiff's position that the cost of such stamps in 1950 and 1951 constituted ordinary and necessary business expenses and consequently, are deductible for tax purposes.

■ It is well settled that the costs of reorganization of a corporation are capital expenditures and not deductible as trade or business expenses. Motion Picture Capital Corp. v. Commissioner,

1. The deduction is appropriate only with respect to discount and expense that is properly carried over to new bonds in the first place. Thus, the deduction is allowed only on retirement of those new bonds issued in exchange for the old general mortgage bonds, not on retirement of new bonds issued partially in exchange for the old 50-year, 5-percent mortgage bonds.

80 F.2d 872 (2d Cir. 1936); Bush Terminal Bldgs. Co., 7 T.C. 793, 818–19 (1946); Bush Terminal Bldgs. Co., 17 T.C. 485, 493 (1951), aff'd 204 F.2d 575, 578 (2d Cir. 1953), cert. denied, 346 U.S. 856, 74 S.Ct. 72, 98 L.Ed. 370.

In this case there is much support in the record to show that the voting trust agreement was an integral part of the reorganization. The voting trust was set up as part of the plan of reorganization. It was designed and approved by those entrusted with the supervision of the reorganization. Furthermore, the necessity for the voting trust arose out of taxpayer's bankruptcy and the plan of reorganization adopted to remedy it. The purpose of the voting trust was to protect the interests of taxpayer's creditors during the first few years after the bankruptcy receivership. The voting trust was as much an integral part of the taxpayer's reorganization as any other measure required by that plan.

Only the 5-year period between the effective date of reorganization and the transfer of stock to the voting trust certificate holders could possibly suggest a lack of connection between the reorganization plan and the use of documentary stamps. But the 5-year postponement of the expense does not prevent it from being an expense of reorganization. The plan of reorganization itself set up every condition necessary to make it certain that the stock transfer taxes would have to be paid. The plan, and the District Court order approving it, required that the stock of taxpayer, as reorganized, was to be delivered to the trustees, not the prospective shareholders; required that after 5 years, at the latest, the stock was to be transferred to the voting trust certificate holders; and required that the tax on the transfer was to be paid by this taxpayer. Thus, not only was the voting trust a device set up to carry out the reorganization, but the expense here in issue was contemplated and imposed upon the taxpayer along with other conditions of its reorganization. Under these circumstances, the expense is one of reorganization.

The taxpayer cites In Re Consolidated Automatic Merchandising Corp., 90 F.2d 598, 601 (2d Cir. 1937), to point out that a voting trust is purely a management device, and that one can have a voting trust without a reorganization. While this is true, it omits the obvious fact that the voting trust can be an integral part of the reorganization if the facts so indicate. Here the voting trust agreement was set up by the reorganization plan as the means of carrying out the reorganization effectively. As the management device employed, it was an integral part of the reorganization. The taxpayer also cites Rev.Rule 54–413, 1954–2 Cum.Bull. 387. That ruling merely stated that in circumstances similar to those in this case the transfer of shares out of a voting trust was not necessary to make the reorganization plan effective; therefore, the taxpayer was not exempt from the documentary stamp tax requirements of the 1939 Code. It does not change the fact that the voting trust agreement here was an integral part of the reorganization plan, nor the fact that the costs of terminating it were part of the taxpayer's reorganization expenses, which are nondeductible.

*The Depreciation Issue*

At all times prior to 1942, taxpayer used the retirement method of computing depreciation on its roadway and miscellaneous physical properties. Under this method, taxpayer did not calculate its depreciation deduction by estimating the portion of each particular asset in service that was used up during the year. Instead, the deduction allowed for depreciation was measured by the entire cost of all assets that were retired from service during the year.

When the years of World War II produced high income and low retirements the taxpayer sought to change from the retirement method of depreciation to the straight-line method. To do this required the permission of the Commis-

sioner of Internal Revenue. The Commissioner required that the taxpayer, as a condition to changing to straight-line depreciation, enter into an agreement called the "terms letter." For the preparation of this agreement, taxpayer made extensive studies to determine the cost (or 1913 value) of its roadway assets and to estimate the total number of years the assets could be expected to last. As adjusted in some instances by the Internal Revenue Service, these original costs and estimates of useful lives were taken to determine the amount of depreciation to be allowed after taxpayer's change-over from retirement to straight-line depreciation. The terms letter sets out the percentage rates of depreciation to be allowed and the total dollar amounts to which these rates were to be applied. The rates incorporated in the terms letter were based upon the whole useful lives of the assets. The total dollar amounts to which these rates were applied were the aggregate costs (or 1913 values) of the assets.

Also, as part of the terms letter agreement, the taxpayer was required to set up a reserve for accrued depreciation, computed by one of three different methods, at the taxpayer's option. The taxpayer's first alternative was to reconstruct its asset accounts from their beginning; depreciation at agreed rates was to be computed for all years and accrued into a depreciation reserve. The second alternative was to compute the reserve by multiplying the expired lives of the assets by the depreciation rates agreed upon for them. The third alternative, and the one adopted by the taxpayer for the purposes of the terms letter agreement, was to compute the reserve by taking 30 percent of the total accounts (at cost or 1913 valuation) and allocating that aggregate amount among the various accounts by a prescribed formula. The terms letter set out the amounts of the reserves for taxpayer, so computed, along with the rates of depreciation allowable. The function of the reserve, as set out in the terms letter, was to limit the remaining sum to be re-covered through depreciation to cost or other basis less the reserve.

The taxpayer agreed to accept the provisions of the terms letter, and for the years 1942 and following, the taxpayer was allowed depreciation at the rates set out in the terms letter.

Plaintiff taxpayer now claims that the Internal Revenue Service erroneously construed the terms letter. Taxpayer argues that under the provisions of the terms letter, it should have been allowed to recover over the remaining life of the asset the total cost of the asset less the 30 percent reserve set out in the agreement. The Government relies on the terms of the agreement and states that the depreciation rates the taxpayer seeks to reject are the appropriate rates.

Therefore, the question for decision is: Were the depreciation rates set out in the terms letter the correct amounts to be allowed the taxpayer upon the changeover from retirement to straight-line accounting?

The terms letter provides for rates of depreciation as contended for by the Government. The taxpayer implicitly admits that the treatment it seeks is not that allowed by the terms letter when it argues that it was forced to accept the whole-life rates as a condition to changing from retirement to straight-line depreciation. Taxpayer's acceptance of the rates of depreciation that were allowed for the years 1942 through 1951 as part of the terms letter, is clear from the correspondence between taxpayer and the Internal Revenue Service which led up to the terms letter agreement. However, despite the acceptance of the terms letter, the taxpayer attacks the agreement on grounds which will be discussed next.

First, the taxpayer argues it should be entitled to recover the cost or other basis of the property over its useful life. According to the taxpayer, the combination of retirement accounting and straight-line at the rates set forth in the terms letter is not reasonably calculated to achieve this end over the useful lives of the assets.

The retirement method does not allocate the cost of a given asset, as such, to the tax periods in which that asset contributed to the production of income. Nevertheless, it was held that the retirement method produced depreciation deductions representing a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business, because the deductions allowed under the retirement method were deemed to result in substantially the same deductions that would result if the straight-line method were used to compute depreciation. Chicago & N. W. R. R. v. Commissioner, 114 F.2d 882 (7th Cir. 1940), cert. denied, 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128 (1941). As was stated in Boston & M. R. R. v. Commissioner, 206 F.2d 617, 619 (1st Cir. 1953):

> It is important to note immediately that the final charge to expense upon the retirement of a piece of equipment is not to be understood as an effort to make up for the failure to take any prior yearly "depreciation" *on this particular item* [emphasis supplied] during its useful life. Rather the underlying theory of the retirement method is that the charges to expense on account of all the items retired or replaced in any particular year are taken as a rough equivalent of what would be a proper depreciation allowance for *all* the working assets of the company for that year. The assumption is that once the system is functioning normally and the retirements are staggered fairly regularly, the charges to expense on account of equipment wearing out or otherwise disappearing from service are spread out and stabilized, and hence will approximate the results under straight-line depreciation. * * *

In other words, under the retirement method, the depreciation deductions, although measured by the cost of assets retired, actually represented depreciation on the assets that were being used up, not depreciation on the assets that were being retired. The rates incorporated in the terms letter were based on the whole useful lives of the assets. The total dollar amounts to which these rates were applied were the aggregate costs (or 1913 values) of the assets.

An example suggested by defendant will show how this worked. Assume an account with assets whose costs (or values as of 1913) totaled $100,000, and assume that the average of the total useful lives of the assets in the account was 40 years. The rate of depreciation set out in the terms letter would be 2.5 percent, and the basis to which that would be applied would be $100,000. The annual amount of depreciation allowance would thus be $2,500.

Therefore, the rate of depreciation to be allowed the taxpayer under the terms letter was entirely consistent with the rationale behind the retirement method of accounting. That rationale was that the deductions under the retirement method represented an approximation of the deductions that would result from use of the straight-line method. What the terms letter did was to allow the taxpayer, for 1942 and subsequent years, to abandon the approximation of the retirement method, and to substitute the more exact results of the straight-line method itself.

The Commissioner was not abusive in prescribing whole-service-life rates for depreciation. In effect, by viewing the pre-1942 years when accounting was on the retirement basis and post-1942 years when the straight-line was used, a straight-line approximation for the entire useful life is achieved. Therefore, the combined methods would be reasonably calculated to recover the taxpayer's investment in its assets.

While the 30-percent reserve is not in issue in this case it is interesting to note it works to taxpayer's advantage on the facts of this case. The 30-percent reflects an estimate that on the average 30-percent of the assets' useful lives had expired by the end of 1942. If less had actually expired, the 30-percent estimate would be too large; if more had expired, the 30-percent estimate would be too

small. In taxpayer's case, 46.6 percent of the useful lives of the assets had expired by 1942, so that the 30-percent reserve represented a figure lower than the depreciation approximated under the retirement method for pre-1942 years. Therefore, it is obvious the 30-percent reserve worked no real hardship to this particular taxpayer.

Second, the taxpayer centers its attention on paragraph 4 of the terms letter which reads:

> (4) that the depreciation rates agreed to are subject to modification if subsequent experience indicates that revision is necessary in order to spread the cost of the assets over their remaining useful lives; such revision, however, is not to be made retroactive;

The taxpayer argues that this provision clearly establishes that the cost (or 1913 value) of the assets less the 30-percent reserve was to be recovered over the "remaining useful lives" of the assets. Furthermore, the taxpayer asserts that there was sufficient information available to the Internal Revenue Service, which was not altered by any subsequent experience, to make it evident that the "remaining life rates" were proper in this case.

Section 39.23(*l*)–5(a), Fed.Tax Reg. 581–82 (1956), states in pertinent part:

> * * * The deduction for depreciation in respect of any depreciable property for any taxable year shall be limited to such ratable amount as may reasonably be considered necessary to recover during the remaining useful life of the property the unrecovered cost or other basis. * * *

The terms letter also uses language to the same effect.

When paragraph 4 of the terms letter is read in conjunction with the statute, the determinative factor is what is reasonable considered necessary at any point in time to recover the taxpayer's investment in property. In 1942, as presented above in this opinion, a combination of retirement and straight-line depreciation over the whole-service-life of the assets was reasonably calculated to recover the total cost. Therefore, it would appear that the Commissioner was not abusive or unfairly exercised his discretion in applying the whole-service-life rates. The whole-life rates were in accord with the statute and regulations, and did not violate the terms letter to which the taxpayer agreed.

The taxpayer makes additional arguments to the effect that it agreed to the terms letter under duress and that an election under section 94 of the Technical Amendments Act of 1958, Pub.L. 85–866, 72 Stat. 1606, 1669 (1958), does not preclude it from the relief it seeks in this case. Since it has been found that the Commissioner did not abuse his discretion in prescribing whole-life rates in 1942, and such rates were reasonably calculated to enable the taxpayer to recover his investment under the theories of retirement and straight-line depreciation, these arguments need not be discussed. There is no credible evidence of duress.

### Mexican Income Tax Credit Issue

During the years 1942 through 1951, taxpayer's railroad cars were interchanged, by intervening United States railroad lines, with various Mexican railroads at certain United States interchange points on the United States-Mexican border and such cars were moved into and were used in Mexico by the Mexican railroads.

For the use of its cars in Mexico, the taxpayer received from the Mexican railroads a rental for each day a car was in Mexico. The car rental income so received by the taxpayer for the years 1942–51 from Mexican sources was subject to tax imposed by the Republic of Mexico upon rentals received by United States railroads for the use of their cars in Mexico pursuant to the terms of the Mexican income tax law. Pursuant to the provisions of the Mexican income tax law, the taxpayer was required to and

did file Mexican income tax returns for each of the years 1942 through 1951 and did pay income taxes for each of those years.

For the purposes of this case the taxpayer contends and the defendant concedes that the taxes paid to Mexico by the taxpayer during the years 1942 through 1951 are taxes for which a credit is to be allowed under section 131 of the Internal Revenue Code of 1939, ch. 2, § 131, 53 Stat. 56. The parties are correct in respect to this matter as the circumstances presented in this case are identical to those in Missouri Pac. R. R. v. United States, 392 F.2d 592, 183 Ct.Cl. 168 (1968). Therefore, that case is authority for the creditability of the tax present in this case.

Once it is determined that the Mexican tax is a creditable tax against taxpayer's United States tax liability, it becomes necessary to compute the credit to which the taxpayer is entitled. Section 131(b) (1) of the Internal Revenue Code of 1939, supra, imposes a limitation upon the amount of the credit which can be taken for creditable foreign taxes. Under this section the maximum amount of the credit is a figure which bears the same relation to the total United States tax against which the credit is taken as the normal tax net income derived from sources within the foreign country bears to the taxpayer's entire normal tax net income. Thus, the maximum amount of the credit may be determined by use of the following formula:

$$\frac{\text{Normal tax net income from Mexico}}{\text{Total normal tax net income}} \times \text{U.S. tax before adjustment in issue}$$

———◆———

Since all the other factors are known, the only problem is to determine taxpayer's taxable income from Mexico. Since the gross income the taxpayer earned from Mexican sources is known, what really remains to be determined is the amount of expenses which the taxpayer incurred in earning the Mexican income.

This same problem under identical circumstances was before the court in Missouri Pac. R. R. v. United States, supra. The taxpayer recites the analysis set forth by the taxpayer in Missouri Pacific. The defendant takes exception to the treatment of general debt expense in that case.

In light of the decision in Missouri Pacific, coupled with the parties' arguments in this case, there is in effect a concession that Missouri Pacific is dispositive with the exception of two items as follows:

(1) The treatment of running repair expense.

(2) The treatment of certain indebtedness. Therefore, in the remainder of this opinion the arguments with respect to these two items will be discussed, and it will be shown that the Missouri Pacific case also is dispositive of the treatment to be accorded these items.

Running repairs are repairs which are made either in trainyards or on tracks, commonly called rip tracks, where relatively minor adjustments and repairs are made. Running repairs consist primarily of work not involving the body of the car at all, such as repairs concerning the wheels, axles, springs, and braking system, although running repairs occasionally include work on the body which is under $50 in cost.

The defendant included running repairs in the total repairs expenses to be ratably allocated between Mexico and the United States. The taxpayer, on the other hand, assigned running repairs on an actually incurred basis. If the repair took place in Mexico, the expense was assigned to Mexico, and if the repair was performed in the United States, the expense was assigned here.

The taxpayer's claim that the expenses of running repairs in Mexico are expenses which are directly assignable to Mexico depends upon whether those expenses accurately reflect the *true* cost of running repairs in Mexico. The true cost of taxpayer's Mexican use is controlled by the contribution the Mexican use made to the necessity for repairs, i. e., the wear and tear taxpayer's cars incurred in Mexico. There is nothing to indicate that the use to which the cars are put in Mexico, and the type of service they render there, would necessitate less repairs. Why then is there disparity in amounts spent for running repairs between taxpayer's on-line repairs to its cars as compared to Mexican repairs and repairs to foreign cars on its lines? The difference results from a conscious policy on the part of the railroad industry to spend more to repair its cars on-line so that the fleet would be in such a condition that there would be less necessity for repairs off-line. Also, a railroad tends to be more diligent in searching for and repairing its own cars than the cars of another, since it is more concerned with the condition of its own fleet. Thus, the taxpayer sees to it that more of the repairs are performed in the United States. The consequent wear and tear of Mexican use is resolved to some extent by the extra care given the cars here in the United States. Therefore, the actual bills for Mexican repairs cannot accurately reflect the expense or true cost of running these cars in Mexico. The assumption that the frequency of running repairs is such that they are made where the wear and tear or other defect actually was incurred is without merit.

In summation, the evidence does not establish that the nature of a daily run in Mexico was easier on the cars and therefore resulted in less need for running repairs. Rather, from all that appears, a Mexican car day contributed equally with a United States car day to the need for running repairs. Therefore, to reflect accurately the true cost incurred in each country, running repairs should be allocated between the two countries on a car-day basis.

With respect to the issue of interest expense, the taxpayer included in its interest expense attributable to freight cars only the interest paid on outstanding indebtedness specifically covering freight cars.

The defendant looks at the entire debt structure and states that the entire debt is a general cost of doing business; and, therefore, that a portion of this debt should be chargeable to taxpayer's freight cars. Thus, the defendant determined the interest costs chargeable to freight cars by computing the ratio of taxpayer's investment in freight cars to its total investment in all tangible assets, and then multiplied that ratio by the total interest costs.

The problem with the defendant's method is that it ignores the statutory direction of section 119(d) of the Internal Revenue Code of 1939, ch. 2, § 119 (d), 53 Stat. 55. What the defendant is really saying is that none of the interest expenses are directly identifiable with or attributable to the income earned in either the United States or Mexico.

On the other hand, the taxpayer is saying that all interest costs, other than those paid on the specific indebtedness which financed the freight cars, are directly assignable to the United States. The taxpayer's approach is in accord with the statute.

The only interest expense which contributes to activity which earns Mexican income is interest which finances the freight cars, since some cars are rented to Mexico. It is hard to comprehend how any of the interest cost on money borrowed to finance installations or moving equipment in the United States has any relationship to the earning of Mexican income.

The taxpayer's method of determining the interest expense attributable to freight cars is adopted, in that it includes interest attributable to the financing of freight cars alone, since such interest ceases to exist when such indebtedness is paid. The interest attributable to the freight cars is to be allocated between the two countries on the basis of car days.

Based on the above reasoning, calculations have been made to arrive at the taxpayer's Mexican freight car expense for the years 1942 through 1951. Using the taxpayer's freight car expenses as shown in finding 58 and substracting these expenses from taxpayer's freight car revenues, taxpayer's normal tax net income from Mexico is determined (finding 59).

Inserting taxpayer's normal tax net income from Mexico into the formula mentioned earlier in the opinion for determining the maximum amount of the tax credit, the allowable credit is determined (findings 60 and 61).

## Summary

In view of the foregoing discussion of the facts and law, the decision with respect to each issue is as follows:

(1) Taxpayer is entitled to recover in part with respect to the bond discount and expense issue.

(2) Taxpayer is not entitled to deductions for documentary stamps.

(3) Taxpayer is not entitled to compute its depreciation deductions on the basis of "remaining life rates" rather than "whole-life rates" for the years 1942 through 1951.

(4) Income tax paid by the taxpayer to Mexico is a creditable tax under the Internal Revenue Code of 1939.

(5) The computation of net income from Mexican sources was made pursuant to the court's analysis in Missouri Pac. R. R. v. United States, supra, the results of such analysis to be found in finding 59.