ARMCO, INC. (FORMERLY ARMCO STEEL CORPORATION AND SUBSIDIARIES), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 20037-85, 45229-85.      Filed April 20. 1987.

*James P. Holden, Kenneth I. Jonson,* and *Joseph P. Esposito,* for the petitioner.

*Joseph R. Goeke* and *Genevieve K. Murtaugh,* for the respondent.

WILLIAMS, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable years 1975, 1976, and 1977 as follows:

| Year | Deficiency |
| --- | --- |
| 1975 ................. | $1,038 |
| 1976 ................. | 6,763,836 |
| 1977 ................. | 6,432,232 |

The year 1975 is before the Court only because certain adjustments in 1976 affect the computation of the tax for 1975. The deficiencies for 1976 and 1977 include increased deficiencies asserted by respondent in his second amendment to answer in docket No. 20037-85 and third amendment to answer in docket No. 45229-85. Petitioner claims an overpayment of tax of not less than $695,932 for 1975, of not less than $6,493,165 for 1976, and of not less than $10,324,247 for 1977.[1]

After concessions, the issues we must decide are (1) whether the 8-percent percentage repair allowance for ferrous metals "reasonably reflect[ed] the anticipated repair experience" of the industry in 1976 and 1977, as required by section 263(e);[2] and (2) whether respondent is barred from requiring petitioner to capitalize certain incidental assets not subject to the percentage repair allowance because he failed to reserve that issue in the Form 870-AD executed for the taxable years 1977, 1978, and 1979.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner Armco, Inc., is a corporation organized under the laws of the State of Ohio. At the time the petitions in these consolidated cases were filed, petitioner's principal office was located at Middletown, Ohio. Petitioner is a diversified

[1]Petitioner contends that it is entitled to several carryforwards and carrybacks of tax benefits during the years in issue which, if allowed, may increase the amount of the claimed overpayments.

[2]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[3]Because of our decision on the first issue, we do not reach another issue raised by the parties as to whether respondent improperly applied the 8-percent percentage repair allowance to items that were not part of the data base from which the repair allowance was derived or to items that are not treated by the industry as repairs.

manufacturing and service corporation engaged in the integrated production of steel and steel products at various facilities in the United States. Petitioner maintained its books and records and timely filed consolidated Federal income tax returns for the taxable years 1975, 1976, and 1977, on an accrual method of accounting.

At petitioner's Middletown Works, petitioner operates a hot strip mill and cold rolling mill which convert large, thick pieces of steel into thin sheet steel. The sheet steel is sold to customers for use in the manufacture of appliances, automobiles, and other products. The parties have agreed that petitioner's Middletown Works provides representative data for all of petitioner's hot and cold rolling manufacturing operations in 1976 and 1977.

In the hot strip mill, slabs of molten steel heated to red-hot temperatures are run through a series of stands, each of which supports cylindrical rolls that apply 1,000 to 2,500 tons p.s.i. of force on the steel slab, compressing and reducing the slab passing between them to the desired thickness. At the end of the hot strip mill, the sheet steel is coiled. Some of the coiled steel is then further processed in the cold mill to produce thinner, longer sheets.

The mill stands, in both the hot strip mill and the cold mill, consist of work rolls which apply pressure to the steel passing between them, bearings at the end of each roll which enable the roll to rotate, chocks which hold the bearings, and the housing which supports the rolls and chocks. There are usually two work rolls, through which the steel actually passes, and two backup rolls that prevent the pressures from excessively deforming the work rolls and press evenly on the work rolls to uniformly reduce the thickness of the steel. The work rolls are driven in opposite directions, and the steel is drawn between them by their rotating movement.

Rolls become worn and deformed in the rolling process. Because deformities on the surface of the work rolls are transferred to the sheets of steel, rendering them unacceptable to customers, the work rolls must be changed frequently. Backup rolls are also worn in the rolling process, but less quickly than the work rolls. When rolls are removed from the mills, they are taken to the roll shop for

grinding and turning. In the grinding process, part of the surface layer of the roll is removed, reducing the diameter of the roll, to achieve a perfectly smooth surface. Depending on the type of roll and the depth of the wear and deformities on the roll, the average amount of surface layer removed in the grinding process ranges from six one-thousandths to fifty one-thousandths of an inch. Rolls may be reground numerous times but once the diameter of a work roll is reduced approximately 2½ inches and the diameter of a backup roll is reduced approximately 6 inches, they must be discarded.

Petitioner includes the salaries and employee benefits of the employees working in the roll shop, as well as utilities and other costs, in roll shop costs on its books and records. During the years in issue, petitioner did not report roll shop costs as repair and maintenance expenses on line 14 of its corporate income tax returns.

During all periods relevant to this case, petitioner has treated replacement rolls and bearings consistently as a production cost incurred in the ordinary course of manufacturing and charged to inventory for financial accounting and tax purposes. Petitioner has never characterized the cost of rolls and bearings as a repair and maintenance expense on the Securities and Exchange Commission Form 10-K, which requires separate identification of all repair and maintenance expenses.

The percentage repair allowance (PRA) concept originated in 1971 as part of the Asset Depreciation Range (ADR) system, which provided a liberalized system of depreciation for machinery, equipment, and certain other property. The PRA was intended to end controversies over whether certain expenditures for the repair, maintenance, or improvement of property are deductible in the year incurred or must be capitalized. If a taxpayer elected to apply the PRA, it could deduct currently, as a repair expense, a prescribed percentage of the unadjusted basis of the property within a specified class of assets without challenge from respondent, provided that it agreed to capitalize any remaining repair expenses attributable to that class. Proposed Income Tax Regs., section 1.167(a)-11, 36 Fed. Reg. 4885 (March 13, 1971) (the proposed regulations), under the ADR system

were published on March 13, 1971, and provided a PRA election. The repair allowance was computed by multiplying the reciprocal of the asset guideline class useful life by the unadjusted basis of the assets within that class. The result was a repair allowance equal to 1 year's depreciation computed on a straight-line basis.

After the proposed regulations were published, individuals at the Treasury Department questioned whether the procedures provided for setting percentage repair allowances reliably measured actual industry repair experience. Among them was Dr. Seymour Fiekowsky, an economist who was at that time Chief of Business Taxation and is currently Assistant Director of the Office of Tax Analysis (Business Taxation) at the Treasury Department. Fiekowsky has a Ph.D. in economics and has been employed with the Treasury Department since 1967. Fiekowsky evaluated the repair allowance described in the proposed regulations and was responsible for developing the methodology used for recommending the repair allowances provided in Rev. Proc. 71-25, 1971-2 C.B. 553, which was issued with the final ADR regulations. The proposed regulations provided a repair allowance of 6.8 percent for ferrous metals. Based on his study, Fiekowsky determined that the repair allowance should have been at least 8.7 percent. Rev. Proc. 71-25, which also set forth the asset guideline periods and depreciation ranges for the asset guideline classes within the ADR system, set the repair allowance for ferrous metals at 8 percent.

Fiekowsky, with the assistance of Kenneth Biederman, a member of his staff, computed repair allowances for various Asset Guideline Classes using the Internal Revenue Service, Source Book on Statistics of Income: Corporation Income Tax Returns (1967) (1967 Source Book), and McGraw-Hill capital spending data. The 1967 Source Book is a compilation of information taken directly from corporation tax returns and was the most recent compilation available in 1971. Fiekowsky recognized the limitations of using 3-year-old data to compute a repair allowance but, because of time and resource constraints, he was unable to get more recent information from industries or other sources.

Fiekowsky computed the ratio of the repair line item in the 1967 Source Book over the depreciable assets line item. He knew that the repair line of the 1967 Source Book, which was taken directly from line 14 of corporation income tax returns, understated the actual repair experience of the ferrous metals industry because taxpayers reported repair expenses on other lines of their corporation income tax returns, for example, as costs of goods sold. Amounts listed on corporate tax returns as cost of goods sold were not reported as repairs in the 1967 Source Book and Fiekowsky thus did not take them into account in computing repair allowances. He knew for other industries repairs may be overstated because of mischaracterization of capital items as repairs. Fiekowsky used the data despite its flaws because his goal was to evaluate the procedures described in the proposed regulations, not to compute an accurate repair allowance.

Because the 1967 Source Book figures reflected expenditures for buildings, to which the ADR system did not apply, in addition to equipment and machinery, Fiekowsky used McGraw-Hill capital spending data to eliminate outlays for depreciable real property from the depreciable assets line. Although he knew that the repair line item, which formed the numerator of the ratio, also included expenditures relating to depreciable real property, Fiekowsky did not make any adjustments because he had no way of knowing what portion of the repair expenditures related to equipment and machinery and what portion related to depreciable real property. Fiekowsky's goal was to provide a basis for evaluating the ratios prescribed in the proposed regulations and not to estimate a correct repair allowance. Had he been consistent and adjusted the numerator for presumed repairs to real property, the overall ratio, and thus, the percentage derived, would have been reduced.

Fiekowsky concluded that the formula used to compute the repair allowance in the proposed regulations was unreliable because it would result in repair allowances far above actual repair experience for most industries and far below actual repair experience for others, including the steel industry. Fiekowsky derived a PRA of 8.7 percent for Asset Guideline Class 33.1, Manufacture of Primary Metals:

Ferrous Metals, using the 1967 Source Book and McGraw-Hill data.

Fiekowsky submitted his findings to the Treasury attorneys responsible for preparing Rev. Proc. 71-25. He explained to them that the 1967 Source Book did not provide statistically reliable figures for repairs and that the percentages he derived did not accurately reflect industry repair experience for equipment and machinery. He was not involved in determining the final percentages that appeared in Rev. Proc. 71-25, including the 8-percent PRA for ferrous metals, class 33.1. The Treasury attorneys responsible for drafting Rev. Proc. 71-25, however, relied on Fiekowsky's figures. They made some unexplained adjustments to the percentages Fiekowsky derived but made no independent investigation of repair experience for the primary ferrous metal industry before Rev. Proc. 71-25 was issued. Fiekowsky knew, based on his study, that the 8-percent PRA for primary ferrous metals was too low. He later stated that the elective nature of the PRA system was the "salve" to his conscience.

Final ADR regulations were published on June 22, 1971. Sec. 1.167(a)-11, Income Tax Regs. Rev. Proc. 71-25, setting forth the asset guideline classes, asset guideline periods, and asset depreciation ranges referred to in the regulation, was also published on June 22, 1971. T.I.R. 1088, 1971-2 C.B. 553.

The Revenue Act of 1971, Pub. L. 92-178, section 109(a), (b), 85 Stat. 497, 508, enacted after the publication of the final ADR regulations, gave legislative approval to the ADR system. The act added section 167(m) and section 263(f), redesignated as section 263(e) effective February 1, 1977, Pub. L. 94-455, section 1904(b)(10)(A)(i), 90 Stat. 1817, to the Code. Section 167(m) authorized the ADR system. Section 263(e) authorized the Treasury Department to issue regulations establishing PRA's for major industry groups, and required that—

Any allowance prescribed * * * shall reasonably reflect the anticipated repair experience of the class of property in the industry or other group.

In 1972, the Treasury Department issued Rev. Proc. 72-10, 1972-1 C.B. 721, which restated the asset guideline classes,

asset depreciation periods, and asset depreciation ranges set forth in Rev. Proc. 71-25 under the rules authorized by section 167(m). Rev. Proc. ·72-10 superseded Rev. Proc. 71-25.

On June 21, 1971, the Office of Industrial Economics (OIE) was established within the Internal Revenue Service.[4] OIE was created to perform continuing studies and adjustments of the repair allowance percentages and to develop revised and updated repair allowances. Fiekowsky was detailed to the Internal Revenue Service to serve as Acting Director of OIE. OIE had two initial priorities. Congress, in enacting section 167(m), requested the Treasury Department to determine whether it would be feasible to establish ADR classes for real property and to investigate whether "subsidiary assets" such as special tools, dies, and jigs should be an overall category or classified by industry. Administrative questions also arose concerning certain classes of assets. OIE conducted studies in these areas, and then began studies of the repair allowances for other asset guideline classes. OIE did not commence studies to update the repair allowances set forth in Rev. Proc. 72-10 until 1975 and did not conduct a survey of the steel industry until 1976. The survey of the steel industry was initiated in part because industry representatives requested that OIE review the 8-percent PRA for ferrous metals.

Thomas Koerner, a Treasury Department economist, under the supervision of Dennis Cox, a Treasury Department economist who had previously performed several studies of other industries, performed a survey of steel industry repair experience. His report, "A Study of Factors Affecting Prescribed Capital Cost Recovery Allowances of Steel Industry Equipment," (the Koerner Study) was published in October 1977. Virtually all of the major members of the steel industry participated in the study. OIE mailed surveys to the participating companies in 1976. The survey requested data on the useful life of assets for 1974 and 1975, and repair, maintenance, and improvement expenditures data from 1971 through 1975.

---

[4] On July 1, 1973, the functions of OIE were transferred from the Internal Revenue Service to the Office of the Secretary of the Treasury.

Koerner determined that the actual repair experience of the steel industry from 1971 through 1975, expressed as a PRA, was as follows:

| Year | Percentage |
|------|-----------|
| 1971 | 11.2 |
| 1972 | 12.1 |
| 1973 | 14.7 |
| 1974 | 17.4 |
| 1975 | 16.5 |

Based on his study, Koerner concluded that the 8-percent PRA for ferrous metals, class 33.1, had been too low since its inception in 1971 and was "entirely too low for the ferrous metals industry in 1977 and beyond." To allow for future conditions such as inflation, Koerner recommended that the PRA for ferrous metals be increased to 18 percent. Because of controversy within the steel industry concerning Koerner's recommendations on class lives, action on Koerner's recommendations as to the PRA was delayed. In 1979, the Treasury Department issued Rev. Proc. 79-42, 1979-2 C.B. 507, raising the PRA for assets used in the manufacture of primary steel mill products from 8-percent to 18 percent.

For its taxable years 1976 and 1977, petitioner elected to apply the 8-percent PRA with respect to its Asset Guideline Class 33.1, Manufacture of Primary Metals: Ferrous Metals. No taxpayer other than petitioner elected the 8-percent PRA for primary ferrous metals. But for its PRA election, all of petitioner's expenses in dispute in 1976 and 1977 for replacement rolls and bearings, assigned maintenance labor, roll shop costs, and employee benefits would have been fully deductible.[5] In computing its PRA for 1976 and 1977, petitioner did not treat replacement roll and bearing costs and expenses associated with the roll shops (with the exception of certain repairs and expenses associated with maintaining the equipment used to grind the rolls in the roll shops) as deductions limited by the 8-percent PRA.

On June 19, 1984, respondent accepted petitioner's Form 870-AD, Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and of Acceptance of Overassessment, for the taxable years 1975 and 1976. The

---

[5]This is the effect of the parties' stipulation No. 44. See note 8 *infra.*

agreement settled a dispute over the current deductibility of certain incidental items used in the steel making process. In a Technical Advice Memorandum issued to petitioner on May 30, 1984, respondent conceded that the incidental items were not subject to the PRA, but stated that expenditures for them should be capitalized. In the Form 870-AD, respondent agreed to settle the incidental items issue but reserved—

the right to make a timely assessment on the grounds that in 1976, certain expenses are not deductible since they are subject to the percentage repair allowance election provided for in Section 1.167(a)-11(d)(2) of the Regulations, and to otherwise adjust the percentage repair allowance.

Respondent admits that he is barred by the terms of the Form 870-AD from making adjustments for 1976 on the ground that the cost of incidental items must be capitalized for reasons independent of the PRA because he did not specifically reserve that issue.

On September 26, 1985, respondent accepted petitioner's Form 870-AD for the taxable years 1977, 1978, and 1979, settling a dispute over the current deductibility of certain incidental items used in the steel making process but reserving—

the right to make a timely assessment on the grounds that in 1977, certain expense items are not deductible since they are subject to the percentage repair allowance election provided for in section 1.167(a)-11(d)(2) of the Regulations, and to make other adjustments relating to the District Director's percentage repair allowance adjustment.

In his notice of deficiency for the taxable year 1976 dated March 27, 1985, respondent determined that because petitioner elected to apply the 8-percent PRA for ferrous metals, class 33.1, certain amounts that petitioner currently deducted on its income tax return for 1976 should have been included as repair allowance property and capitalized. In his notice of deficiency for the taxable year 1977 dated September 30, 1985, respondent determined that because petitioner elected to apply the 8-percent PRA, certain amounts that petitioner deducted on its income tax return for 1977 should have been included as repair allowance property and capitalized.

OPINION

The first issue we must decide is whether the 8-percent percentage repair allowance for ferrous metals authorized by section 1.167(a)-11(d)(2), Income Tax Regs., and prescribed by Rev. Proc. 72-10, was invalid in 1976 and 1977 because it did not "reasonably reflect the anticipated repair experience" of the industry in those years, as required by section 263(e). This is an issue of first and last impression for this Court. No taxpayer other than petitioner has elected the 8-percent PRA, and Congress repealed the entire PRA system in 1981 effective for property placed in service after December 31, 1980, in taxable years ending after such date. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 203, 95 Stat. 172, 221. Petitioner contends that the 8-percent PRA does not implement the congressional mandate in a reasonable manner and is, therefore, invalid. Respondent argues that the 8-percent PRA reasonably reflected the anticipated repair experience of the steel industry during the years in issue and is valid, but that we need not consider the validity of the repair allowance because petitioner's election is irrevocable, and petitioner is, therefore, precluded from challenging the PRA's validity.

We first consider whether petitioner may challenge the validity of the 8-percent PRA. If we accept respondent's position that once a taxpayer elects to be bound by a regulation, he cannot challenge the validity of that regulation, then no elective regulation could be challenged, no matter how onerous its provisions or unreasonable its implementation of the statute.[6] Respondent relies on several cases holding that elections affecting the reporting of Federal income tax are irrevocable. E.g., *J.E. Riley Investment Co. v. Commissioner*, 311 U.S. 55 (1940); *Pacific National Co. v. Welch*, 304 U.S. 191 (1938); *McShain v. Commissioner*, 65 T.C. 686 (1976); *Estate of Stamos v. Commissioner*, 55 T.C. 468 (1970), but see *Matheson v. Commissioner*, 74 T.C. 836 (1980). In none of these cases,

---

[6]If petitioner had not elected to apply the 8-percent PRA for its taxable years 1976 and 1977, we doubt that it would have had standing to challenge the regulatory scheme. See *Allen v. Wright*, 468 U.S. 737, 766 (1984); see also *Scheide v. Commissioner*, 65 T.C. 455, 456 (1975). It is also doubtful that an injunction action would lie under the narrow exception to sec. 7421(a) carved out by *South Carolina v. Regan*, 465 U.S. 367 (1984), since petitioner could not demonstrate any harm to it suffered by choosing not to make the election.

however, was the validity of the regulation questioned. More apposite to the issue here is *Buck v. Commissioner*, 40 B.T.A. 537 (1939). In *Buck*, the taxpayer challenged the validity of a regulation that by election applied to him, and the Board of Tax Appeals held that the regulation in question was invalid. The regulation, therefore, was not binding on petitioner despite his election. *Buck v. Commissioner*, 40 B.T.A. at 540; see *American Standard, Inc. v. United States*, 220 Ct. Cl. 411, 602 F.2d 256 (1979); *Orgill Bros. & Co. v. United States*, 508 F.2d 1219, 1221 (6th Cir. 1975). We, therefore, hold that petitioner may challenge the validity of the 8-percent PRA.

Petitioner asks us to invalidate section 1.167(a)-11(d)(2), Income Tax Regs., for the taxable years 1976 and 1977 because it authorized the 8-percent repair allowance for ferrous metals in those years, which did not "reasonably reflect the anticipated repair experience" of the industry as section 263(e) required. A Treasury regulation is valid only if it "implements the congressional mandate in some reasonable manner." *Rowan Companies, Inc. v. United States*, 452 U.S. 247, 252 (1981) (quoting *United States v. Correll*, 389 U.S. 299, 307 (1967)); *Baetens v. Commissioner*, 777 F.2d 1160 (6th Cir. 1985), revg. 82 T.C. 152 (1984); *Estate of Bullard v. Commissioner*, 87 T.C. 261, 268 (1986). The validity of the regulation, however, is not at issue. The regulation simply provided that repair allowance percentages, until revised, would be set forth in Rev. Proc. 72-10. Sec. 1.167(a)-11(d)(2)(iii)(*b*). Rev. Proc. 72-10 prescribed the 8-percent PRA for ferrous metals for 1976 and 1977, and it is the failure to revise that revenue procedure that is at issue in this case.

In the Revenue Act of 1971, Pub. L. 92-178, section 109(b), 85 Stat. 497, Congress specifically authorized the Treasury Department to develop and update repair allowances for classes of property within the ADR system. Section 1.167(a)-11(d)(2), Income Tax Regs., which is the foundation for Rev. Proc. 72-10, is, therefore, a legislative regulation and entitled to heightened deference.[7] Although

---

[7] A regulation issued under a specific statutory grant of authority is entitled to greater deference than one issued under a general statutory mandate. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982); *Rowan Companies, Inc. v. United States*, 452 U.S. 247, 253 (1981). Either type of regulation will be held invalid, however, if it does not harmonize with the

it is an administrative pronouncement and not a regulation, Rev. Proc. 72-10 also is entitled to some deference because it was issued pursuant to the congressional mandate to develop and update repair allowance percentages. See H. Rept. 92-533, at 34 (1971), reprinted in 1971 U.S. Code Cong. & Admin. News 1825, 1849; S. Rept. 92-437, at 50-51 (1971), reprinted in 1971 U.S. Code Cong. & Admin. News 1918, 1957. Whether Rev. Proc. 72-10 stands, however, does not depend on the standard of deference we accord it. Under the most deferential standard of review, Rev. Proc. 72-10 fails because, for the years before us, it does not harmonize with the plain language, origin, or purpose of section 263(e) and does not implement the congressional mandate in any reasonable manner. Cf. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 25-26 (1982); *Rowan Companies, Inc. v. United States*, 452 U.S. at 252, 253. In fact, during the years before the Court, the Treasury Department failed completely to implement the congressional mandate.

The plain language of the enabling statute, section 263(e), required respondent to prescribe repair allowances that "reasonably reflect anticipated [industry] repair experience." In enacting section 263(e), which gave legislative approval to the PRA system, Congress recognized that additional study would be needed to revise and update the repair allowances provided in Rev. Proc. 71-25. Congress nonetheless endorsed the repair allowances in the revenue procedure for *initial use*:

Your committee's bill also provides that the Treasury Department may, by regulations, provide for the treatment of repairs. To provide a means of resolving the disputes which frequently arise as to whether an item constitutes a deductible repair expense or a nondeductible capital expenditure, it is provided that the Treasury may prescribe repair allowances for classes of depreciable property which reasonably reflect the anticipated repair experience with respect to the class of property in the industry or other group. The repair allowances are to be developed and modified by the Treasury on the basis of data collected by it regarding the repair experience of the industry or other group with respect to the class of property. *Initially, it is expected that the repair*

statute's plain language, origin, and purpose. *United States v. Vogel Fertilizer Co.*, 455 U.S. at 25, 26; *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477 (1979). Legislative history is a primary source for verification of whether a regulation is consistent with statutory intent. See generally *United States v. Vogel Fertilizer Co.*, 455 U.S. at 16; *Estate of Bullard v. Commissioner*, 87 T.C. 261 (1986).

*allowances prescribed by Rev. Proc. 71-25 will be used.* It is expected that the Treasury will have the same authority to provide classes for this purpose as with the class life system of depreciation. [H. Rept. 92-533, *supra* at 34. 1972 U.S. Code Cong. & Admin. News 1825, 1849. Emphasis added.]

The Senate Report contains the same language. S. Rept. 92-437, *supra* at 50-51. The 8-percent PRA thus conformed to the statutory mandate in 1971.

Although Congress endorsed Rev. Proc. 71-25 in the committee reports accompanying the Revenue Act of 1971, it was apparently not aware of the flaws in the methodology used to derive the repair allowances prescribed. The Treasury Report on the ADR system presented to Congress on September 8, 1971, did not inform Congress of the shortcomings of the repair allowances prescribed in Rev. Proc. 71-25. See Tax Proposals Contained in the President's New Economic Policy: Hearings Before the House Ways and Means Committee, 92d Cong., 1st Sess. 177 (1971) (New Economic Policy Hearings). The information available to Congress described the repair allowances in Rev. Proc. 71-25 as allowances "based on a Treasury Department evaluation of statistical and other data by industry classes reflecting industry experience with respect to [repair] expenditures." New Economic Policy Hearings, *supra* at 180.

After the proposed ADR regulations were published in 1971, Seymour Fiekowsky, then Chief of Business Taxation at the Treasury Department, was asked to evaluate the repair allowance described in the proposed regulations and to develop a methodology for use in deriving the repair allowances provided in Rev. Proc. 71-25, which was issued with the final ADR regulations. The formula provided in the proposed regulations resulted in a 6.8-percent repair allowance for ferrous metals. Fiekowsky computed repair allowances using data from 1967 corporate tax returns compiled in the 1967 Source Book on Statistics of Income. He derived a repair percentage of 8.7 percent for ferrous metals by taking the ratio of the repair line item over the depreciable assets line item in the 1967 Source Book. Because the 1967 Source Book figures included expenditures for depreciable real property to which the ADR system did not apply, Fiekowsky used McGraw-Hill capital spend-

ing data to eliminate these costs from the depreciable assets line. Rev. Proc. 71-25, and subsequently Rev. Proc. 72-10, set the percentage repair allowance for ferrous metals at 8 percent.

The methodology that Fiekowsky used to derive repair percentages for ferrous metals and other classes of assets was seriously flawed. First, the data in the 1967 Source Book was at least 3 years old when Fiekowsky conducted his study. Second, the repair line item in the 1967 Source Book was taken directly from line 14 of corporation income tax returns. Line 14 understates the actual repair experience of the ferrous metals industry because taxpayers also report repair expenses on other lines of their corporation income tax returns, such as the cost of goods sold line. Third, the repair line, used as the numerator of the ratio Fiekowsky derived, included expenditures for depreciable real property. Fiekowsky used McGraw-Hill capital spending data to eliminate these amounts from the denominator, but did not attempt to do so for the numerator. Fiekowsky was aware of the problems with the ratios he derived and that the 1967 Source Book did not provide a statistically reliable figure for repairs. The Source Book, however, was the only comprehensive classification of all U.S. corporations available in 1971, and time and resource constraints precluded Fiekowsky from seeking more accurate information from the industry.

Fiekowsky was not involved in drafting the final ADR regulations or accompanying revenue procedure but explained the flaws in his methodology to the attorneys who drafted Rev. Proc. 71-25. Fiekowsky did not intend for the ratios he derived or the methodology from which they were derived to be used in the revenue procedure. The attorneys, however, performed no independent investigation of industry repair experience and made only minor, unexplained adjustments to Fiekowsky's ratios. The 8-percent repair allowance adopted in Rev. Proc. 71-25 remained unchanged in 1976 and 1977.

OIE was established in 1971 to undertake continuing studies necessary to develop revised and updated repair allowances. Despite the flawed methodology and specific knowledge that an 8-percent PRA for ferrous metals was

inadequate, OIE did not commence a study of the steel industry until 1976. OIE first devoted attention to areas that Congress specifically mentioned in enacting the Revenue Act of 1971. Pub. L. 92-178, sec. 109(a), (b), 85 Stat. 497; see H. Rept. 92-533, *supra* at 35; S. Rept. 92-457, *supra* at 52. After it completed those studies, OIE began in 1975 to review and update Rev. Proc. 72-10.

Thomas Koerner conducted the OIE study of the steel industry in 1976. He surveyed virtually all of the major members of the steel industry and concluded, as Fiekowsky had previously determined, that the 8-percent repair allowance had been too low in 1971. Koerner also found that the 8-percent PRA had become less reflective of industry repair experience in each subsequent year. The actual repair experience of the steel industry between 1971 and 1975, expressed as a PRA, was as follows:

| Year | Percentage |
|------|------------|
| 1971 | 11.2 |
| 1972 | 12.1 |
| 1973 | 14.7 |
| 1974 | 17.4 |
| 1975 | 16.5 |

Eight percent represented less than half of the actual repair experience of the industry in 1975, the year prior to petitioner's election to use the PRA. Koerner recommended that the PRA for ferrous metals be increased to 18 percent to allow for future conditions. Although his study was published in 1977 and demonstrated the severe inadequacy of the 8-percent PRA for ferrous metals, the PRA was not increased to 18 percent until 1979. See Rev. Proc. 79-42, 1979-2 C.B. 507.

Congress endorsed the 8-percent PRA for ferrous metals provided in Rev. Proc. 71-25, but it did so only for *initial* use. Congress recognized that continuing studies would be needed to keep the repair allowances in conformity with the statutory mandate. See H. Rept. 92-533, *supra* at 34; S. Rept. 92-437, *supra* at 51. Yet, Treasury waited 5 years to begin a study of the steel industry and, after the study was published confirming that the 8-percent PRA had always been wholly inadequate, delayed making the necessary adjustment another 2 years.

Respondent contends that even though OIE did not commence its study of the steel industry until 1976, it did so as quickly as possible given its work load and, therefore, did not violate the congressional directive that the percentages in Rev. Proc. 71-25 be used only initially. Respondent's only explanation for Treasury's waiting 2 years after the results of the steel industry study were published to raise the 8-percent repair allowance for ferrous metals to 18 percent was a controversy within the steel industry over the recommendations on class lives in Koerner's study which led to additional internal review of the study.

It cannot be doubted that OIE had a heavy work load and limited resources. A heavy work load, however, is not an adequate excuse for 7 years of failure to comply with the statutory mandate, especially since Treasury knew that the PRA was too low when it was initially promulgated. Petitioner should not be forced to bear the consequences of these shortcomings. We do not believe that the need for additional internal review of the class lives recommendations in the Koerner study was sufficient cause for a 2-year delay in implementing the needed change in the PRA.

Respondent also argues that the 8-percent PRA remained a reasonable estimate of anticipated industry repair experience in 1976 and 1977. See sec. 263(e). The Koerner Study refutes respondent's contention. Koerner found that to accurately reflect the repair experience of the steel industry in 1975, the PRA should have been 16.5 percent, and because of anticipated inflation, recommended that the PRA be increased to 18 percent for 1977 and later years. The Koerner study indicated that industry repair costs increased almost every year between 1971 and 1975. The 8-percent PRA was thus even less reflective of anticipated industry repair experience in 1976 and 1977 than it was in 1975. Congress recognized that the repair allowances could not be updated on an annual basis and thus did not require Treasury to conform precisely to industry repair experience, but it required that any repair allowance established "reasonably reflect anticipated [industry] repair experience." Sec. 263(e).

OIE's failure to act more quickly to update the repair allowances provided in Rev. Proc. 72-10 is even more

egregious given that Treasury was well aware that the repair allowances for many of the classes of assets listed, including ferrous metals, understated actual repair experience from the outset. Fiekowsky's goal in deriving repair allowances for the classes of assets within the ADR system had been to provide a basis for evaluating the procedures prescribed in the proposed regulations, and not to compute an accurate repair allowance. Yet Treasury made no effort to expedite studies to provide accurate repair allowances.

We, therefore, find that Rev. Proc. 72-10, insofar as it prescribed the 8-percent PRA for ferrous metals, class 33.1, for 1976 and 1977, is invalid because the 8-percent PRA did not "reasonably reflect the anticipated repair experience" of the industry in those years, as required by section 263(e). Petitioner is, therefore, not bound by its election pursuant to section 1.167(a)-11(d)(2), Income Tax Regs., to apply the 8-percent PRA in 1976 and 1977.[8]

The final issue that we must decide is whether respondent is barred from requiring petitioner to capitalize the cost of certain incidental items used in the steel manufacturing process for reasons independent of the 8-percent PRA assets in 1977 because he failed to reserve that issue in the Form 870-AD executed for the taxable years 1977, 1978, and 1979. In the Forms 870-AD executed for the taxable years 1975 and 1976 and the taxable years 1977, 1978, and 1979, respondent reserved the right to make adjustments to certain items in 1976 and 1977 on the ground that they are subject to the 8-percent PRA. In addition, in the Form 870-AD for 1975 and 1976, respondent reserved the right, for 1976, "to otherwise adjust the percentage repair allowance." In the Form 870-AD for 1977, 1978, and 1979, respondent reserved the right, for 1977, "to make other

---

[8]Respondent argues for the first time on brief that he will be disadvantaged procedurally if petitioner is allowed to revoke its election of the 8-percent PRA for 1976 and 1977. Because of petitioner's PRA election, respondent accepted petitioner's characterization of certain items as currently deductible. If petitioner had not made the election, those items would have been subjected to a case-by-case review to determine whether they should be expensed pursuant to sec. 162 or 212 or capitalized pursuant to sec. 263. Many in fact appear to be capital expenditures. The parties stipulated, however, that all expenses in dispute would be "fully deductible" but for the PRA election. Issues raised for the first time on brief are not properly before us. By failing to raise this issue in his notice of deficiency, answer, amended answers, or opening statement, respondent has waived his right to argue it. See *Aero Rental v. Commissioner*, 64 T.C. 331, 338 (1975).

964

adjustments relating to the District Director's percentage repair allowance adjustment."

Respondent concedes that he is barred from arguing that the cost of certain incidental items incurred in 1976 must be capitalized for reasons independent of the PRA because he did not reserve that issue in the Form 870-AD executed for 1976. He argues, however, that the difference in the language used in the reservation for 1977 permits him to make the same argument for costs of incidental items incurred in 1977. We find no material difference between the language used in the two Forms 870-AD. In both, respondent reserved only the right to make adjustments to items subject to the PRA. Respondent has conceded that the costs of the incidental items at issue in this case were not subject to the PRA. We, therefore, hold that the Form 870-AD executed for the taxable years 1977, 1978, and 1979 bars respondent from arguing that costs incurred for incidental items in 1977 must be capitalized.

To reflect the concessions,

*Decisions will be entered under Rule 155.*