CSX CORPORATION, AS SUCCESSOR BY MERGER TO CHESSIE SYSTEM, INC., AND AFFILIATED COMPANIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7521-82, 30341-83.    Filed July 23, 1987.

*John W. Tissue, Garth E. Griffith,* and *Lynne B. Klopf,* for the petitioner.

*Lewis R. Carluzzo* and *Sara M. Coe,* for the respondent.

TANNENWALD, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Docket No.[1] | Year | Deficiency |
|---|---|---|
| 7521-82 | 1973 | $2,373,810 |
| 30341-83 | 1974 | 100,000 |
| | 1975 | 100,000 |
| | 1976 | [2]100,000 |

After agreements by the parties, the remaining issues for decision are whether petitioner (1) in changing from the declining-balance method to the straight-line method of depreciation, must determine its depreciation allowance by utilizing a rate based on a whole-life or remaining-life calculation, and (2) is entitled to include in the depreciable basis of its roadway assets amounts for interest and taxes

---

[1]Pursuant to a motion filed and granted at trial on Sept. 30, 1985, these cases were consolidated for purposes of trial, briefing, and opinion.

[2]The deficiencies for 1974 through 1976 are in even amounts because petitioner paid the excess $100,000 over the amounts in dispute; petitioner claims an overpayment with respect to such excess amounts.

during construction as were estimated by the Interstate Commerce Commission pursuant to the Railroad Valuation Act of 1913.

This case was submitted fully stipulated under Rule 122. This reference incorporates herein the stipulations of facts and attached exhibits.

### General Facts

CSX Corp. (CSX) is a Virginia corporation, with its principal office at Richmond, Virginia. CSX is the successor to Chessie System, Inc. (CSI) by virtue of a statutory merger under Virginia law on November 1, 1980, between CSX, CSI, and Seaboard Coast Line Industries, Inc. (SCLI). Upon such merger, the separate identities of CSI and SCLI,previously unaffiliated corporations, became merged into one corporation, CSX, the petitioner in this case.

The issues herein relate to the 1973, 1974, 1975, and 1976 taxable years, with respect to which consolidated Federal corporation income tax returns were filed by CSI, as the common parent corporation of an affiliated group of corporations during such years and on behalf of the other members of that affiliated group, with the Internal Revenue Service Center, Baltimore, Maryland.

The Chesapeake & Ohio Railway Co. (C&O), the Baltimore & Ohio Railroad Co. (B&O), Western Maryland Railway Co. (WM), Chessie Resources, Inc. (which, in 1981, was renamed CSX Resources, Inc., hereinafter Resources), and Railease, Inc., (Railease) were members of the affiliated group of corporations of which CSX is and has been the common parent corporation since the date of the merger between CSX, CSI, and SCLI. C&O is a Virginia corporation with its principal office at Cleveland, Ohio. B&O and WM are each Maryland corporations with their principal office at Baltimore, Maryland. Railease is a Delaware corporation with its principal office at Cleveland, Ohio. Resources is a Virginia corporation with its principal office at Richmond, Virginia.

C&O, B&O, and WM are, and have been since before 1973, common carriers by rail subject to the jurisdiction of the Interstate Commerce Commission (ICC). C&O, B&O, and WM are class I railroads. Such carriers are subject to a uniform system of accounting and bookkeeping as prescribed by the

ICC pursuant to 49 U.S.C.A. sec. 20 (1970). Railease is, and has been since before 1973, principally engaged in the acquisition, financing, and leasing of railroad locomotives, rolling stock, and equipment. Resources is, and has been since before 1975, principally engaged in the business of managing and developing non-rail real estate, managing investments in oil and gas exploration, managing forest reserves, and operating a sawmill.

During the taxable years 1973 through 1976, CSI, C&O, B&O, WM, Resources, and Railease maintained their books and records and filed consolidated Federal corporation income tax returns on an accrual method of accounting and on the basis of the calendar year.

*Change in Method of Depreciation*

In various years after 1953 and before 1970, C&O, B&O, and Railease (collectively referred to hereinafter as petitioners) acquired railroad rolling stock, roadway machines, shop machinery, communication systems, and signals and interlockers. All of such property was "qualified property" within the meaning of section 1.167(a)-12(a)(3), Income Tax Regs., and was properly includable in asset guideline Class 40.1 pursuant to Rev. Proc. 72-10, 1972-1 C.B. 721. The portion of such property which is involved in this case was included by these petitioners in a single, open-end, multiple-asset account for each petitioner. Each such account was initially depreciated under the 200-percent declining-balance (DDB) method of depreciation. The three accounts are hereinafter referred to as "the C&O DDB account," "the B&O DDB account," and "the RL DDB account," respectively. In each of the years 1972 through 1976, petitioners elected to apply section 1.167(a)-12, Income Tax Regs., to Class 40.1.

All of the qualified property of C&O, B&O, and Railease in Class 40.1 was accounted for in 1973, 1974, 1975, and 1976 in depreciation accounts which conformed to the asset guideline class, in that all of their Class 40.1 property was included in such accounts, and no other property was so included. The depreciation for each such account was determined by using a rate based upon a 14-year class life, equal to the asset guideline period for Class 40.1 as set forth in Rev. Proc. 72-10, *supra*.

In the consolidated Federal corporation income tax returns filed for the calendar years 1972 and 1973, petitioners changed from the DDB method to the straight-line method of depreciation for the C&O DDB account (changed 1972), the B&O DDB account (changed 1973), and the RL DDB account (changed 1972), by computing depreciation on such accounts under the straight-line method for the year of change and in all succeeding tax years.

In 1973, the average unadjusted basis of the assets in the C&O DDB account was $266,421,639, the average unadjusted basis of the assets in the B&O DDB account was $112,717,135, and the average unadjusted basis of the assets in the RL DDB account was $139,081,124. In computing depreciation in their 1973 return for all three accounts, petitioners applied a rate (one-fourteenth) based on the class life to the average unadjusted basis of the assets in each account:

| Account | Average unadjusted basis | Depreciation claimed (1/14) |
|---|---|---|
| C&O DDB account | $266,421,639 | $19,030,117 |
| B&O DDB account | 112,717,135 | 8,051,224 |
| RL DDB account | 139,081,124 | 9,934,366 |
| | | 37,015,707 |

Respondent, however, determined the allowable depreciation for each account for the 1973 taxable year, in accordance with Rev. Rul. 75-195, 1975-1 C.B. 78, by dividing the number of years remaining in the class life of the account into its average adjusted basis for 1973, as computed before taking account of any depreciation allowance for 1973. Respondent computed the allowable depreciation as follows:

| Account | Average basis less average reserve before 1973 depreciation | | | Remaining years | Depreciation allowed |
|---|---|---|---|---|---|
| C&O DDB | $266,421,639 | less | $162,078,385 | 7.41 years | $14,081,411 |
| B&O DDB | 112,717,135 | less | 56,635,630 | 9.40 years | 5,966,118 |
| RL DDB | 139,081,124 | less | 87,700,515 | 7.22 years | 7,116,428 |
| | | | | | 27,163,957 |

Respondent determined the number of years remaining in the class life of each of the three accounts (as of the beginning of 1973) by dividing the average adjusted basis of the account, computed as if the account had always been depreciated under the straight-line method, by the average unadjusted basis of the account, and multiplying the result

by the 14-year class life used with respect to the account. Respondent computed the remaining years, in accordance with Rev. Rul. 75-195, *supra*, as follows:

| Account | *Adjusted basis (as if straight line) divided by unadjusted basis* | Class life | *Remaining years* |
|---------|-------------------------------------------------------------------|------------|-------------------|
| C&O DDB | $141,006,235/$266,421,639 | 14 | 7.41 years |
| B&O DDB | $75,687,991/$112,717,135 | 14 | 9.40 years |
| RL DDB | $71,743,507/$139,081,124 | 14 | 7.22 years |

In determining depreciation allowable on the three acounts in question for each of the years 1974, 1975, and 1976, both petitioners and respondent used the same procedures that each had used for 1973. There is no dispute as to the arithmetical correctness of either petitioners' or respondent's calculations.

*Basis of ICC Valuation Property*

The railroad properties and related facilities ("roadway assets") of C&O, B&O, and WM (the Railroads), like those of most other railroads in the United States, were initially constructed during the 19th century, prior to the establishment of modern accounting methods, principles, and recordkeeping, and prior to the incidence of the Federal corporation income tax. Moreover, the Railroads, like most of the other railroads in the United States, did not maintain accurate and complete detailed records showing the historical costs of their roadway assets between the dates that the railroad companies were organized and the dates of valuation of their assets by the ICC pursuant to the Railroad Physical Valuation of Property Act of March 1, 1913, 37 Stat. 701, subchapter V of chapter 107 of title 49 U.S.C. sec. 19a (1970) (Railroad Valuation Act). Additionally, in the case of B&O, an indeterminate amount of corporate records were destroyed at Baltimore on February 7, 1904, in a holocaust fire which completely consumed a portion of the city, including the B&O central headquarters building.

Under the Railroad Valuation Act, the ICC was required to determine and report in detail what is sometimes referred to as the "Federal Inventory value" of all physical properties of the railroads on the basis of available records and application of engineering valuation techniques to empirical data derived from research pertaining to the railroads. The

ICC was directed by law to determine original cost to valuation date, cost of reproduction new, cost of reproduction less depreciation and other values, and elements of value. For the Railroads, Federal Inventory valuations of roadway assets were made as of June 30, 1916, for C&O, as of June 30, 1918, for B&O, and as of June 30, 1919, for WM.

In making its determinations, the ICC established and followed methods and procedures applicable generally to the railroad industry, including the Railroads. This valuation technique is described in the *Texas Midland Railroad* valuation decision, which was officially published in the ICC's valuation series of reports, 75 I.C.C. Val. Rept. 1 (1918), at 29-33, 108 et seq.

As a preliminary valuation was completed, each railroad was afforded an opportunity to object, to comment, and to make adversary presentations to the ICC to assist it in making its final valuation determinations. The Railroads made presentations in respect of the preliminary valuation findings of the ICC, which were reported at 24 I.C.C. Val. Rept. 451 (1929) for C&O, at 42 I.C.C. Val. Rept. 1 (1933) for B&O, and at 32 I.C.C. Val. Rept. 1 (1930) for· WM; however, no change was made which affected the amounts of interest and taxes incurred during construction as determined by the ICC under the principles described in the *Texas Midland Railroad* valuation decision.

In the *Texas Midland Railroad* valuation decision, the ICC estimated that 1½ percent on all assets in the roadway accounts except land would produce a reasonable amount to be included in the valuation for general expenditures, including taxes, during construction. (See 75 I.C.C. Val. Rept. 1, at 29-31). The ICC also concluded that a 6-percent interest rate would be ample, and that this interest rate should be applied for one-half of the construction period plus 3 months, in arriving at an estimate of the amount to be included in the valuation for interest incurred during construction. (See 75 I.C.C. Val. Rept. 1, at 141-142).

Since the Federal Inventory valuation dates, the Railroads have continued to use the roadway assets in their business, with retirements having occurred from time to time. These retirements were subject to various accounting treatments for tax purposes.

From the incidence of the Federal corporation income tax until 1943, the Railroads accounted for all roadway assets except rolling stock (such as locomotives, freight cars, and work equipment) under a system of depreciation accounting known as the retirement-replacement-betterment method, sometimes referred to simply as the retirement method or the RRB method, as described in *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352, 360 (1975). Rolling stock is not involved in this issue.

The ICC, by order dated June 8, 1942, and effective January 1, 1943, determined that the roadway assets other than rolling stock of railroads generally, including the Railroads, should be switched from the RRB method and become subject to ratable depreciation, except that the investments in railroad grading in Property Account 3, as prescribed by the ICC uniform System of Accounts (ICC Account 3), in tunnel bores (apart from tunnel linings, ventilating and lighting systems, retaining walls, etc.) in ICC Account 5, and track structure comprised of the several components of assets maintained in five ICC accounts—Ties (ICC Account 8), Rails (ICC Account 9), Other Track Material (ICC Account 12)—were unaffected by the ICC decision.

In 1943 and thereafter, following the ICC decision, the Railroads' investments in roadway assets affected by the ICC decision (hereinafter sometimes referred to as ratably depreciable roadway property) have been subject to ratable depreciation for Federal income tax purposes, including assets placed in service both before and after 1943; investments in track structure were subject to the RRB method; and investments in grading and tunnel bores were nondepreciable as to C&O and B&O until their 1954 taxable year.

Due to the ICC order, the Railroads wanted to make a similar accounting method change for Federal income tax purposes. In 1942, the Railroads applied for permission to change from the RRB method to a ratable depreciation method with respect to the aforementioned roadway properties. In connection with the Railroads' request for respondent's permission to change their method of accounting, respondent issued instructions in a document known as

Mimeo 58, which was circulated to the Railroads and other railroads.

In Mimeo 58, it was stated that property acquired prior to the date of Federal Inventory valuation by the ICC could be set up on the basis of such valuation in lieu of a valuation at March 1, 1913, but that interest and taxes during construction could not be included in the depreciation base of the property changed from the RRB method to ratable depreciation. The Railroads submitted schedules constructed in accordance with the instructions included in Mimeo 58. The Railroads were aware, and the submitted schedules reflect, that respondent expressly required the Railroads to exclude interest and taxes during construction from the depreciable basis of the assets.

In 1944, respondent sent each Railroad a letter (hereinafter sometimes referred to as the terms letter) setting forth the conditions under which respondent would permit each Railroad to change from the RRB method of accounting for depreciation of certain of its roadway assets to a ratable depreciation method. Neither the terms letters nor the schedules pertinent thereto make any reference to interest and taxes during construction with respect to the Federal Inventory property involved. The specific terms found in these letters were limited to matters pertaining to the reserve for depreciation, the remaining recoverable sum, depreciation rates, and other related accounting matters. The Railroads accepted the specific conditions as set forth in the appropriate terms letters.

OPINION

*Issue 1. Change in Method of Depreciation*

Under section 109 of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, section 167(m) was added to the Internal Revenue Code to provide a unified elective class life depreciation system with respect to property placed in service after December 31, 1970. Section 167(m) authorizes respondent to prescribe regulations setting forth class lives which reasonably reflect the anticipated useful lives of certain classes of assets, and provides that depreciation determined by utilizing these class lives will be deemed a

"reasonable allowance" for depreciation and entitled to a deduction under section 167(a). Accordingly, rules with respect to the class life system of depreciation for assets placed in service after December 31, 1970, were so promulgated and are now embodied in section 1.167(a)-11 of respondent's regulations (hereinafter sometimes referred to as the Asset Depreciation Range or ADR regulations).

In addition, while section 167(m), and the regulations promulgated thereunder, were intended to apply only to assets placed in service after December 31, 1970, the committee reports of both congressional houses provided that "Although the class life system is not applicable with respect to assets placed in service prior to January 1, 1971, the Treasury Department may provide an elective guideline life system for such assets similar to the class life system." S. Rept. 92-437 (1971), 1972-1 C.B. 559, 587; H. Rept. 92-533 (1971), 1972-1 C.B. 498, 516. As a result, section 1.167(a)-12, Income Tax Regs., was promulgated to provide an elective class life system of depreciation for pre-1971 assets (hereinafter referred to as the class life system), such as those which formed the basis of petitioner's depreciation deductions at issue herein (hereinafter, these regulations will sometimes be referred to as the class life regulations). It is the proper application and interpretation of certain sections of these regulations, with respect to a change in method of depreciation from declining balance to straight line, which we are required to determine.

Section 1.167(a)-12(a)(5)(i), Income Tax Regs., provides in relevant part, that:

(5) *Determination of reasonable allowance for depreciation*—(i) *In general.* The allowance for depreciation of qualified property to which the taxpayer elects to apply this section shall be determined in accordance with this section. The annual allowance for depreciation is determined by using the method of depreciation adopted by the taxpayer and a rate based upon a life permitted by this section. *In the case of the straight-line method of depreciation, the rate of depreciation shall be based upon the class life (or individual life if the taxpayer assigns individual depreciable lives in accordance with subdivision (iii) of this subparagraph) used by the taxpayer with respect to the assets in the asset guideline class. Such rate will be applied to the unadjusted basis of the asset guideline class (individual assets or depreciation accounts if the taxpayer assigns individual depreciable lives).* * * * [Emphasis added.]

Petitioner, in accordance with this language, determined its allowance for depreciation with respect to the unrecovered basis of its assets simply by dividing the unadjusted basis of these assets by their guideline class life, i.e., 14 years. This method is commonly referred to as the whole-life calculation. See p. 138 *supra.*

Respondent contends that determination of the correct allowance for depreciation, where, as here, the taxpayer has changed its method of depreciation, is governed instead by section 1.167(a)-12(a)(5)(v), Income Tax Regs., which provides:

(v) *Method of depreciation.* The same method of depreciation must be applied to all property in a single depreciation account. The method of depreciation is subject to the limitations of section 167(c),(j) and (l). Except as otherwise provided in this subdivision, the taxpayer must apply a *method of depreciation* described in section 167(b)(1), (2), or (3) for qualified property to which the taxpayer elects to apply this section. A method of depreciation permitted under section 167(b)(4) may be used under this section if the method was used by the taxpayer with respect to the property for his last taxable year ending before January 1, 1971, the method is expressed in terms of years, the taxpayer establishes to the satisfaction of the Commissioner that the method is both a reasonable and consistent method, and if the taxpayer applies paragraph (b)(2) of this section (relating to class lives in special situations) to determine a class life, that the method of determining such class life is consistent with the principles of Revenue Procedure 62-21 as applied to such a method. If the taxpayer has applied a method of depreciation with respect to the property which is not described in section 167(b)(1), (2), (3), or (4) (as permitted under the preceding sentence), he must change under this section to a method of depreciation described in section 167(b)(1), (2), or (3) for the first taxable year for which an election is made under this section. *Other changes in depreciation method may be made with the consent of the Commissioner (see sec. 446 and the regulations thereunder). (See also sec. 167(e).)* [Emphasis added.]

Respondent argues that this language clearly shows that changes in a taxpayer's method of depreciation will be made in conformity with section 167(e), which provides, in relevant part:

SEC. 167(e). CHANGE IN METHOD.—

(1) CHANGE FROM DECLINING BALANCE METHOD.—In the absence of an agreement under subsection (d) containing a provision to the contrary, a taxpayer may at any time elect in accordance with regulations prescribed by the Secretary or his delegate to change from

the method of depreciation described in subsection (b)(2) [declining balance] to the method described in subsection (b)(1) [straight line].

In turn, section 1.167(e)-1(b), Income Tax Regs., which was promulgated in accordance with section 167(e)(1), provides in relevant part:

(b). *Declining balance to straight line.* In the case of an account to which the method described in section 167(b)(2) is applicable, a taxpayer may change without the consent of the Commissioner from the declining balance method of depreciation to the straight line method at any time during the useful life of the property under the following conditions. Such a change may not be made if a provision prohibiting such a change is contained in an agreement under section 167(d). *When the change is made, the unrecovered cost or other basis (less a reasonable estimate for salvage) shall be recovered through annual allowances over the estimated remaining useful life determined in accordance with the circumstances existing at that time.* \* \* \* [Emphasis added.]

Accordingly, respondent determined that petitioner should not have used the whole-life calculation in computing its allowance for depreciation as defined in section 1.167(a)-12(a)(5)(i), Income Tax Regs., but instead should have depreciated its adjusted basis in its assets over the remaining class life of those assets.[3] This is commonly referred to as the remaining-life calculation. See pp. 138-139 *supra.*

As a comparison of the computations on pages 138-139 *supra,* reveals, use of the whole-life calculation usually results in an annual depreciation allowance substantially higher than would otherwise be determined on the basis of the remaining-life calculation, with the result that the depreciable basis still remaining (i.e., the asset's adjusted basis), at the time the change from the declining-balance to the straight-line method takes place, is recovered over a shorter period of time. This is so because an asset's adjusted basis is depreciated on the basis of the remaining-life calculation ratably over the remaining class life of the asset. On the other hand, the asset's adjusted basis is recovered on the basis of the whole-life calculation utilizing the annual allowance for depreciation which would have been available if the asset had always been depreciated

[3]In Rev. Rul. 75-195, 1975-1 C.B. 78, respondent defined the "estimated remaining useful life determined in accordance with the circumstances existing at the time," for purposes of applying the remaining-life calculation under the class life regulations, as the "remaining class life" as calculated by the formula contained therein. See pp. 138-139 *supra.*

under the straight-line method, without regard to the remaining class life of the asset. Thus, in a situation in which the change of method takes place at that point in time when the depreciation deduction allowed under the declining-balance method falls below what would otherwise have been allowed if the asset had always been depreciated under the straight-line method (which is the typical scenario), a switch to straight line accompanied by utilization of the whole-life calculation results in higher yearly deductions and operates to recoup the cost of the asset over a class life shorter than provided for under the class life system.[4]

Petitioner argues that the language of section 1.167(a)-12(a)(5)(i), Income Tax Regs., not only permits, but requires, just such a result, and that section 1.167(e)-1(b), Income Tax Regs., neither controls, nor was ever intended to control, a change in method of depreciation with respect to pre-1971 assets under the class life system found in section 1.167(a)-12 of the regulations. Respondent, on the other hand, argues that the remaining-life calculation embodied in section 1.167(e)-1(b), Income Tax Regs., is incorporated into the class life regulations and does indeed apply to the instant situation, and that petitioner has overstated the amount of its allowable depreciation deduction in each of the years in issue. For the reasons herein discussed, we agree with respondent.

Before addressing petitioner's specific arguments, a preliminary observation is in order. With the exception of an argument that respondent was without authority to promul-

[4]The following example illustrates the difference in the use of the whole-life and remaining-life calculation: Assume a taxpayer purchases an asset for $1,000, which has a 10-year life and no salvage value. Under the straight-line method of depreciation, the taxpayer would be entitled to depreciation deductions of $100 per year. Under a 200-percent declining-balance method of depreciation, however, the taxpayer would be entitled to a deduction of $200 in the first year ($1,000 × (20 percent)), $160 in the second year ($800 × (20 percent)), $128 in the third year ($640 × (20 percent)) $102.40 in the fourth year ($512 × (20 percent)), and $81.92 ($409.60 × (20 percent)) in the fifth year, etc. Now, let's further assume that after the fourth year the taxpayer switches from the declining-balance to the straight-line method of depreciation.

The taxpayer would be entitled to annual depreciation deductions of $100 based on the whole-life calculation until the total remaining cost of the asset (i.e., $409.60) was recovered, which would occur soon after the end of year 8. On the other hand, if the taxpayer computed its depreciation based on the remaining-life calculation, the asset's remaining adjusted basis would be recovered ratably over the next 6 years until the end of the asset's class life, at a rate of approximately $68 per year.

gate his regulations under his chosen statutory instrument (sec. 167(e)(1)), see pages 150-151, *infra,* petitioner does not argue that respondent's position with respect to his regulations is plainly inconsistent with statutory language or with congressional intent. See, e.g., *Armco, Inc. v. Commissioner,* 88 T.C. 946 (1987). Nor is the instant case one where respondent might have been able to cover a situation in his regulations but failed to do so. See *Dunn Trust v. Commissioner,* 86 T.C. 745, 755 (1986); *Larson v. Commissioner,* 66 T.C. 159, 185-186 (1976). Petitioner does not herein dispute that respondent possessed the authority to prescribe application of the remaining-life calculation where there is a change from the declining-balance to the straight-line method of depreciation under the class life regulations. Rather, petitioner contends that, while respondent could have adopted such an approach if he had so desired, he purposefully adopted instead the whole-life calculation with respect to the treatment to be afforded to the assets covered by such a change in method, and that we should so construe section 1.167(a)-12, Income Tax Regs. Petitioner advances this interpretative argument despite regulatory language which supports respondent's contrary interpretation (i.e., application of the remaining-life calculation described in section 1.167(e)-1(b), Income Tax Regs.), and uncontradicted evidence that respondent has consistently applied and adhered to such an approach ever since the regulations were first adopted. See Rev. Rul. 75-195, 1975-1 C.B. 78, which details the proper application of the remaining-life calculation, and Rev. Rul. 77-477, 1977-2 C.B. 67, which amplifies this explanation.

Petitioner argues that "in the case of the straight-line method of depreciation, the regulation [sec. 1.167(a)-12(a)(5)(i), Income Tax Regs.] expressly states a single rule which without exception, required use of the whole-life method of calculation." This is simply not true. That section merely provides that "in general" the whole-life calculation is to be applied in the case of straight-line depreciation. While petitioner is correct when it points out that section 1.167(a)-12(a)(5)(i), Income Tax Regs., does not "distinguish between cases involving the initial use of the straight-line method of depreciation and cases involving the

use of the straight-line method following a change in the method of computing depreciation from the declining-balance method," we agree with respondent that section 1.167(a)-12(a)(5)(v), Income Tax Regs., provides just such a distinction and, through incorporation by reference, mandates that the remaining-life calculation found in section 1.167(e)-1(b), Income Tax Regs., be applied to pre-1971 assets following a change in method from declining balance to straight line.

Section 1.167(a)-12(a)(5)(v), Income Tax Regs., which is entitled "Method of depreciation" and discusses, in general, the methods of depreciation allowable under the class life system, provides, in relevant part, that:

If the taxpayer has applied a method of depreciation with respect to the property [not deemed allowable herein], he must change under this section to a method of depreciation described in section 167(b)(1),(2), or (3) for the first taxable year for which an election is made under this section. *Other changes in depreciation method may be made with the consent of the Commissioner (see sec. 446 and the regulations thereunder). (See also sec. 167(e).)* [Emphasis added.]

Section 1.167(e)-1(b), Income Tax Regs., specifically provides for application of the remaining-life calculation upon a change from the declining-balance to the straight-line method. See p. 145 *supra.*

Petitioner, however, argues that the parenthetical cross-reference to section 167(e) appears in section 1.167(a)-12(a)(5)(v), Income Tax Regs., only in the context of a discussion of the procedural rules applicable when a taxpayer seeks to change its method of depreciation, and that it was inserted simply to recognize that section 167(e) provides an exception to the general rule found in section 446(e) that consent from respondent is normally required for changing a taxpayer's method of depreciation. Accordingly, it concludes that respondent never intended to incorporate substantive computational rules (i.e., the remaining-life calculation) into the regulations under section 167(e).

Petitioner bases its argument in support of this position by directing us to a comparison of the language found in section 1.167(a)-11(c)(1)(i)(*b*) of the asset depreciation range regulations, which the class life regulations refer to as providing a "similar system" of depreciation (see sec.

1.167(a)-12(a)(i), Income Tax Regs.). Section 1.167(a)-11(c)(1)(i)(*b*), Income Tax Regs., carries out the "in general" provisions of section 1.167(a)-11(c)(1)(i)(*a*) and provides for application of a whole-life calculation in determining the proper allowance for depreciation under the straight-line method. It then specifies "See subdivision (iii)(*b*) of this subparagraph for the manner of computing the depreciation allowance following a change from the declining balance method * * * to the straight line method." Subdivision (iii)(*b*), in turn, provides for the use of the remaining-life calculation upon such a change. Petitioner argues that, if respondent had intended that the remaining-life calculation was to be used where there is a change in method to straight line under the "similar" class life regulations, he would have followed the same path as was followed in the ADR regulations instead of indirectly incorporating such rules into these regulations by a vague reference to section 167(e), and would have expressly provided, by cross-reference, an exception to the general rule requiring use of the whole-life calculation. According to petitioner, the absence of such a cross-reference in the class life regulations, given the similarity of the two sets of regulations, leads to the inference that no such exception was ever intended.

We think a more studied reading of the ADR regulations not only argues against such an inference, but in fact supports respondent's position. We agree with petitioner, as does respondent, that both sets of regulations provide for similar systems of depreciation. Accordingly, from a conceptual standpoint, we think it odd that respondent would adopt a remaining-life calculation under the ADR regulations and, in contrast, a whole-life calculation with respect to pre-1971 assets. Rather, we think the better view is that the use of the external cross-reference to section 167(e) in the class life regulations, instead of the use of an internal cross-reference as found in the ADR regulations, merely reveals a difference in approach taken by the drafters of each set of regulations in an attempt to reach the same end result, i.e., application of the remaining-life calculation. This is borne out by a look at the different structures of the two regulations. While the drafters of the class life regulations decided to go outside those regulations and incorporate the

remaining-life calculation in the regulations under section 167(e), the drafters of the ADR regulations took a different tack. They provided that "The provision of section 1.167(e)-1 shall not apply to any change in depreciation method permitted under this section" (see sec. 1.167(a)-11(c)(1)(iii)(*a*), Income Tax Regs.), and then in the subsequent subdivision provided for the application of the remaining-life calculation. See sec. 1.167(a)-11(c)(1)(iii)(*b*), Income Tax Regs. While we agree with petitioner that the different approach taken in the ADR regulations seems to be more to the point and therefore clearer, we attach no significance to the difference in approach between the two regulations.

Petitioner next argues that, since the cross-reference found in section 1.167(a)-12(a)(5)(v), Income Tax Regs., is only to section 167(e) itself, which provides, in relevant part, that "a taxpayer may at any time elect in accordance with regulations prescribed by the Secretary or his delegate to change from" the declining-balance to the straight-line method of depreciation (sec. 167(e)(1)), and not to the computational regulations promulgated thereunder in section 1.167(e)-1(b), Income Tax Regs., such computational rules were not intended to be incorporated into the class life regulations. Petitioner has substituted literalism for commonsense. Section 167(e)(1) makes clear reference to the regulations to be promulgated in accordance therewith and, accordingly, these regulations are to be viewed as part and parcel of that section. We are hard pressed to imagine a taxpayer who, once directed to section 167(e), would not read these regulations and, after doing so, would conclude that it was not bound by the rules contained therein.

In the alternative, petitioner argues that, even if the regulations promulgated in accordance with section 167(e)(1) are to be incorporated into section 1.167(a)-12(a)(5)(v)·of the class life regulations, section 167(e)(1) was intended only as a procedural election section and therefore respondent has no authority to prescribe substantive computational regulations thereunder,[5] but only regulations with respect to the procedural aspect of electing the straight-line method.

---

[5]Petitioner argues only that respondent had no authority to prescribe such computational rules under sec. 167(e), not that he had no authority to prescribe such rules (i.e., a remaining-life calculation under the class life regulations, generally. See pp. 146-147 *supra*.

Petitioner posits that any computational rules should have been included, instead, in the regulations promulgated under authority of section 167(b), which provides, in relevant part, that "the term 'reasonable allowance' as used in subsection (a) shall include * * * an allowance *computed* in accordance with regulations prescribed by the Secretary or his delegate." (Emphasis added.) Petitioner, once again, adopts too literal an approach.

Although the language of section 167(e)(1) does not explicitly make the election to adopt the straight-line method "subject to such conditions as may be prescribed by the Secretary or his delegate by regulations," compare section 167(m)(3), we think it clear that this is the only logical interpretation to be ascribed to the words "elect in accordance with regulations prescribed by the Secretary or his delegate" found in section 167(e)(1), and was in fact intended by the legislative drafters. The Senate Finance Committee, in explaining the amendment which it proposed to add section 167(e)(1) to the Internal Revenue Code of 1954, provided that—

> The other amendment allows taxpayers availing themselves of the declining-balance method an option to switch to straight-line depreciation at any time in the life of a property. The straight-line rate would be based on the realistic estimate of remaining life of the property at the time of the switch. Moreover, the rate would thereafter be applied to the depreciated balance of the account at the time of the switch, less a realistic estimate of salvage value. [S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 27 (1954).]

Clearly then, the Senate Finance Committee envisioned certain substantive requirements which were to be followed by a taxpayer upon electing a "consent-free" change in method from declining balance to straight line. Accordingly, we think that respondent was authorized to incorporate computational conditions into the regulations promulgated under section 167(e)(1).[6]

Petitioner next argues that respondent's arguments are not based upon any considerations of policy. Aside from

---

[6]We note that the Conference Committee report accepted the Senate amendment which it explained "added a new subsection (e) to section 167 of the House bill providing that a taxpayer may change (under regulations prescribed by the Secretary) from the declining-balance method to the straight-line method." Conf. Rept. 2543, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 29 (1954).

any question as to the relevancy of such an argument to our decision herein, we disagree. As we have noted at pages 145-146 and in note 4 *supra*, by utilizing the whole-life calculation, a taxpayer is able to depreciate assets over a period of time shorter than the guideline lives prescribed by the class life regulations. We believe that such a result could not have been intended. The generally shorter, artificially determined guideline class lives already provide taxpayers with a benefit by accelerating the recovery of their basis in depreciable property. To confer yet additional benefits on certain taxpayers simply because they have elected a change in method of depreciation seems illogical, and we find no support for such an argument in either the regulations or the legislative history.

Finally, petitioner argues that the remaining-life calculation set forth in section 1.167(e)-1(b), Income Tax Regs., conflicts with, and cannot be easily incorporated into, the class life regulations and that this is further proof that the drafters of the regulations did not intend to incorporate that section therein. We recognize that the remaining-life calculation detailed in section 1.167(e)-1(b),. Income Tax Regs., appears to differ in certain respects from the application of that calculation embodied in the class life regulations (namely, in its treatment of salvage value and perhaps in its definition of remaining life).[7] But we are satisfied that these differences, when viewed in light of the other evidence already discussed herein which favors respondent's position, are not sufficient to support petitioner's view that the class life regulations mandate application of the whole-life calculation.

In the final analysis, what the instant case involves is whether petitioner's highly technical arguments based on the structure of respondent's regulatory framework should be accepted or whether we should accord to respondent's regulations the weight to which they are usually entitled.

---

[7]Sec. 1.167(a)-12(a)(5)(vi), Income Tax Regs., provides that no adjustment is to be made for salvage value except as an overall limitation on the total amount of allowable depreciation while sec. 1.167(e)-1(b), Income Tax Regs., provides for an initial adjustment for salvage value. Sec. 1.167(a)-12(a)(5)(i), Income Tax Regs., provides a fixed formula for determining remaining life, while sec. 1.167(e)-1(b), Income Tax Regs., provides that remaining life shall be determined "in accordance with the circumstances existing at the time" of change from the declining-balance to the straight-line method of depreciation. In Rev. Rul. 75-195, note 3 *supra*, respondent equated the facts and circumstances standard with the formula.

That weight is founded on the premise that respondent's regulations should be sustained unless unreasonable or plainly inconsistent with the statute (see *Fulman v. United States*, 434 U.S. 528, 533 (1978)), and is particularly applicable in the area of accounting methods (cf. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 533 (1979)). We are also cognizant of the principle that construction of the Internal Revenue Code by respondent is an element to be taken into account (see *Hanover Bank v. Commissioner*, 369 U.S. 672, 686 (1962)), and that such a construction, applicable to the instant case, is reflected in Rev. Rule 75-195, *supra*. See *Philadelphia Saving Fund Society v. United States*, 167 F. Supp. 814, 815 (E.D. Pa. 1958), affd. 269 F.2d 853 (3d Cir. 1959). Cf. *United States v. Massey Motors, Inc.*, 264 F.2d 552, 557-558 (5th Cir. 1959), affd. 364 U.S. 92 (1960). Neither the fact that there may be some logical force to petitioner's arguments (see *Fulman v. United States*, *supra* at 534) nor that we might have drawn the regulations more artfully had we been charged with the responsibility for so doing, which we are not (see *Fulman v. United States*, *supra* at 536; *United States v. Correll*, 389 U.S. 299, 306-307 (1967)), furnish a sufficient basis for rejecting the explicit language of section 1.167(e)-1(b), Income Tax Regs. Although it cannot be gainsaid that, given the complexities of our present-day revenue laws, taxpayers ought to be afforded a less intricately woven fabric in respondent's regulations (cf. *Corn Belt Hatcheries of Arkansas, Inc. v. Commissioner*, 52 T.C. 636, 639 (1969)), we are unable to conclude that petitioner's technical arguments are sufficient to tip the scales in its favor. The eye of petitioner's needle is simply too small to thread. We decide this issue for respondent.[8]

### Issue 2. Basis of ICC Valuation Property

The second issue is whether petitioner's basis for depreciation with respect to its roadway assets, properly includes

---

[8]It is irrelevant to our decision herein that respondent, with respect to the taxable years 1971-76, did not disallow on petitioner's returns depreciation deductions taken with respect to certain B&O assets, which were computed using the whole-life (as opposed to the remaining-life) calculation. Not only is depreciation with respect to these assets not at issue herein, but petitioner's election to straight line with respect to those assets took place in 1961, more than 10 years before the promulgation of the class life regulations. Respondent's action certainly does not rise to the level of estoppel. See p. 157 et seq. *infra*.

the ICC estimates of construction period interest and taxes as were established by the ICC pursuant to the Railroad Valuation Act of 1913. Respondent argues that petitioner's basis should exclude these particular estimates.[9]

Respondent has already litigated this issue twice, once in this Court (*Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497 (1980)), and once in the Court of Claims (*Southern Railway Co. v. United States*, 218 Ct. Cl. 150, 585 F.2d 466 (1978)), and in both cases his position was rejected on the merits.[10] Respondent asks us not to follow these two opinions and further argues that both of these cases are distinguishable from the factual situation at issue herein.

In *Southern Railway*, the Government argued that the ICC estimate of construction period interest and taxes should be excluded from the taxpayers' depreciable basis because the taxpayers therein had not proven that they had actually incurred such costs. The Court of Claims rejected the Government's argument stating emphatically that—

Manifestly, the estimates made by the ICC provide the best, and in fact the only, available source for determining the tax bases of the taxpayers' properties. Accordingly, we hold that the *Cohan* rule [*Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930)] should be applied in these cases with respect to the ICC estimates of taxes and interest during construction. [*Southern Railway Co. v. United States*, *supra* at 470.]

The court then proceeded to analyze the ICC's specific analysis by which it estimated interest and taxes, as described in *Texas Midland Railroad*, 75 I.C.C. 1, 153-158

[9]Respondent, on brief, only argues that estimates with respect to interest and taxes during construction should be excluded from the assets' depreciable basis. However, as is clear from the record, amounts attributable to "general expenditures" incurred during construction were also disallowed by respondent as includable in the assets' basis for depreciation. It may be that the "general expenditures" amounts include some amounts for taxes by virtue of a book transfer in 1975. In any event, we have assumed, for purposes of our discussion and decision herein, that respondent's arguments apply equally to these estimated amounts.

[10]We note that in both of these decisions only property depreciated under the RRB method was involved. However, the discussion therein which analyzed whether it was proper for the taxpayers to include amounts attributable to interest and taxes during construction, as estimated by the ICC, in the depreciable basis of the RRB property, is applicable generally to all the roadway assets at issue herein, all of which were valued pursuant to the Railroad Valuation Act of 1913. In this connection, we note that respondent's arguments based upon consideration of estoppel, etc. (see p. 157 et seq. *infra*) apply only to petitioner's roadway property which became subject to the ratable method of depreciation after the 1944 approved changeover and not to such property which remained subject to the RRB method of depreciation.

(1918)[11] (see *Southern Railway Co. v. United States, supra* at 471), and found that these estimates adequately reflected amounts of interest and taxes actually paid by the railroads. The Court of Claims concluded by adding that—

it was also "obviously illogical and incorrect" for the Commissioner to accept the ICC estimates for 44 out of 46 component costs of constructing plaintiffs' railroads while refusing to accept the estimates for taxes and interest, even as a starting point. There is no rational explanation for the Government's position; its unreasonableness is demonstrated acutely by the fact that the IRS has accepted other overhead items, including engineering, organization expenses, general officers' and clerks' salaries, legal expenses, and the cost of stationery.

Perhaps a major fallacy in the Government's refusal to allow the use of the estimates for taxes and interest for any purpose rests on its mistaken notion that the accepted items are "known expenditures," the cost of which was "reasonably ascertainable." * * * This position is patently incorrect, as shown by the ICC explanation of its methodology for all of its valuations. See *Texas Midland, supra*, at 108-82."

[585 F.2d at 472.]

In *Southern Pacific*, we reached the same conclusion as the Court of Claims. Noting that respondent "made much the same argument in *Southern Railway*," 75 T.C. at 846, we undertook a similar analysis and held that—

We concur with the Court of Claim's analysis of the *Texas Midland* report. We believe it is readily apparent that the ICC's reproduction cost new includes reasonable estimates of interest and taxes actually paid during construction. The *Texas Midland* report clearly does not establish, as respondent contends, that the figures for interest and taxes used by the ICC were theoretical and therefore not properly chargeable to the capital account. [75 T.C. at 848.]

Moreover, we also concluded that—

We see no benefit to be derived from singling out any of the specific components comprising the total estimate for special scrutiny. There is no logic for any requirement that the various elements comprising reproduction cost new should be more accurate or verifiable than the whole. Nor should one element be required to be more accurate a reflection of actual cost than is any other element. See 585 F.2d at 473. Accordingly, we hold, as did the Court of Claims in *Southern Railway Co. v. United States, supra*, that the ICC amounts used by petitioner on its returns to show the cost of the retired assets at issue are not to be

[11]As we noted *supra* at p. 140, the valuation technique utilized in valuing roadway assets pursuant to the Railroad Valuation Act of 1913 was described in the *Texas Midland Railroad* decision.

reduced to eliminate interest and taxes during construction. [75 T.C. at 848.]

Despite the clear holdings to the contrary in both of these cases, respondent once again argues that we should exclude any amounts for interest and taxes during construction, because "petitioner is unable to establish that any amounts for interest and taxes were actually paid." Respondent contends that, in contrast to the property actually inspected and valued by the ICC, there is no physical evidence that any amounts for interest on taxes during construction have ever been paid by the Railroads, and accordingly petitioner has not proven that it is entitled to deductions for these amounts.

Respondent claims that the new evidence he has produced for purposes of this litigation, namely, selected portions of a report entitled "The Federal Valuation of the Railroads in the United States," prepared by B.H. Moore for presentation to the American Railway Engineering Association in 1952, supports his position. Respondent argues that this report clearly demonstrates that the ICC, in estimating the amounts for interest and taxes during construction, did not, as it did with the other components which went into its overall estimate, first verify that any amounts attributable to these components had actually been paid or incurred by the railroads. Accordingly, respondent maintains that the ICC estimates with respect to interest and taxes do not establish that any amounts for interest and taxes were ever actually paid by the Railroads and therefore, absent production by petitioner of further evidence (e.g., books and records) that such amounts were so paid, we should exclude these amounts from the Railroads' depreciable basis. Moreover, respondent suggests that *Southern Railway* is distinguishable because, in that case, the taxpayer presented evidence by way of affidavits that some expenditures for interest were in fact made. See 585 F.2d at 470.

Respondent's new arguments are merely revamped versions of outworn claims. The affidavits submitted in *Southern Railway* are too thin a reed upon which to distinguish that case from the one before us. Not only did these affidavits apparently not show that any amounts were spent for taxes but, after referring to those affidavits, the

Court of Claims went on to point out: "In *Texas Midland, supra,* at 155, the Commission explained that interest during construction *'is universally conceded* [to be] * * * an item of expense in the construction of the property which should be included in a reproduction estimate.' " *Southern Railway Co. v. United States,* 585 F.2d at 470-471. (Emphasis in original.) Moreover, in *Southern Pacific,* we made no reference to the presence of any such affidavits or comparable evidence of some payment and nevertheless concluded that "the ICC's reproduction cost new includes reasonable estimates of interest and taxes *actually paid* during construction." 75 T.C. at 848. (Emphasis added.) Accordingly, we reject respondent's plea that we not follow our prior decision in *Southern Pacific*[12] and that of the Court of Claims in *Southern Railway.*[13]

Respondent argues in the alternative that, even if the amounts for interest and taxes during construction as estimated by the ICC would otherwise be included in the basis for depreciation with respect to those assets still subject to the RRB method of depreciation, petitioner is estopped from adding such amounts to the basis of the assets with respect to which petitioner secured respondent's consent to change from the RRB to the straight-line method of depreciation. Respondent contends that the Railroads, as a condition to securing respondent's consent (see p. 142 *supra*), irrevocably agreed to exclude from their basis for depreciation all amounts for interest and taxes during construction. Petitioner, of course, argues that it made no such agreement and therefore is now entitled to claim deductions based on the inclusion of these amounts in the basis for depreciation, with respect to those assets subject to the straight-line method. For the reasons herein set forth, we agree with petitioner.

[12]It is interesting to note that respondent does not suggest that we apply *Burnet v. Houston,* 283 U.S. 223 (1931). As we observed in *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. 497, 848 n. 430 (1980), "Given the availability of a recognized substitute cost, we do not read *Burnet v. Houston* as requiring a showing of actual expenditures in the factual circumstances presently before us. The use of the ICC amounts as a substitute for cost in a case like the one at bar *presupposes* that actual cost cannot be shown." (Emphasis in original.)

[13]Similarly, we conclude that the ICC estimates with respect to general expenditures incurred during construction (see note 9 *supra*) are reasonable estimates of costs actually paid by the Railroads.

The facts are not in dispute. As we discussed (*supra* at pp. 141-142), upon receiving the Railroads' requests to change their method of depreciation, respondent issued a document referred to as "Mimeo 58" which listed five specific conditions to which the Railroads were required irrevocably to agree upon changing their method. In addition to these conditions, Mimeo 58 also stated, among other things, that "Interest and taxes may not be included in the depreciation basis." Accordingly, the Railroads submitted depreciation schedules to respondent which excluded any amounts for interest and taxes during construction from the assets' basis for depreciation. Thereafter, respondent sent each Railroad a terms letter with attached schedules. The terms letter repeated the five specific conditions and added a sixth condition (to which each Railroad was required to agree irrevocably to follow) in order to obtain permission for the change in method of depreciation. Each Railroad accepted the conditions listed in the terms letter. However, while the schedules included in these letters in fact did not include any amounts attributable to interest and taxes during construction, as we noted *supra* at page 142, the terms letters themselves, made no reference to, or specifically required the exclusion of, such amounts from the assets' basis for depreciation.

Respondent argues that—

> while the terms letter did not expressly reiterate all of the requirements of Mimeo 58 it was clear that such terms were to be incorporated by virtue of the depreciation schedules involved.
>
> Consequently, petitioner irrevocably agreed, as a condition to the respondent's consent to change the method of accounting for the railroads involved, that interest and taxes during construction as estimated by the ICC would not be a part of depreciable basis. The fact that such condition was not expressly set forth in the terms letter is not significant. * * *

We disagree.

In *Chicago, Burlington & Quincy RR. Co. v. United States*, 197 Ct. Cl. 264, 278, 455 F.2d 993, 1001 (1972), revd. on other grounds 412 U.S. 401 (1973) (the CB&Q case), the issue was whether the taxpayer, by complying with respondent's instructions in Mimeo 58 that "Donated property or contributions or grants in aid of construction from any

source must be excluded [from the basis of depreciation]" (a statement which almost immediately follows the previously quoted statement as to the exclusion of interest and taxes (see p. 158 *supra*)), entered into a binding agreement to be bound by these instructions. As in the instant case, with respect to interest and taxes, the terms letter made no reference to the exclusion of donated property from the basis for depreciation, but the schedules submitted to respondent in accordance with Mimeo 58 in fact excluded such amounts. The court found that—

The statement "Donated property or contributions or grants in aid of construction from any source must be excluded" *was only the opinion of the Service with respect to what constituted the basis allowable under the Code and does not rise to the level of a condition upon which permission to change depreciation methods would be granted.* [5] * * *

[5]Similarly, [the taxpayer's] failure to include the donated property here at issue in the schedules of [the taxpayer's] property for which straight line depreciation was requested and in the later revised schedules may reflect no more than [the taxpayer's] apparent opinion at those times that such property was not depreciable.

[455 F.2d at 1001. Emphasis added.]

Moreover, the court concluded that—

Furthermore, the 1944 terms letter itself, which constitutes the only agreement between the parties, says nothing about excluding donated property from the basis of depreciable property. While it might be argued and inferred that [the taxpayer] agreed by implication to such condition in the guidelines, it is just as reasonable to infer that [the taxpayer] acquiesced in the condition, without agreeing with it, simply to avoid possible refusal of its requested change in accounting methods.

[455 F.2d at 1002.]

We agree with the reasoning of the Court of Claims in the CB&Q case. In this connection, we recognize that the Court of Claims had before it (as we do not herein) the text of the taxpayer's letter of acceptance of respondent's terms letter in which the taxpayer stipulated that it would not be precluded from obtaining the benefits of any change in the terms and conditions "by statutory amendment, by operation of law, or otherwise." 455 F.2d at 1002. The Court of Claims, after holding that the reference to the statement in Mimeo 58 in respect of the inclusion of donated property in basis was not a condition of the terms letter, went on to observe that, even if it had concluded that such statement was a condition, the taxpayer's position would have been

preserved by virtue of the reservation in its acceptance letter. We view this observation as, at most, an alternative ground to support the decision of the Court of Claims and not as an essential link in the primary basis of its decision. Nor do we consider, as respondent would have us do, that our holdings in *Denver & Salt Lake Railway Co. v. Commissioner*, 24 T.C. 709, 719 (1955), and *Denver & Rio Grande Western Railroad Co. v. Commissioner*, 32 T.C. 43, 46-50 (1959), affd. on other grounds 279 F.2d 368, 371-372 (10th Cir. 1960), require us to hold that the terms letters herein, as construed by respondent, must be given binding effect. Those cases involved the proper interpretation of one of the six express conditions of the terms letters, namely, the application of "depreciation accounting" to the question of the impact on basis of losses on the disposition of the taxpayer's assets. Indeed, initially this Court took the position that even in interpreting an express condition of the terms letter, respondent's argument as to the "necessary implication" of that letter should be rejected observing—

Such an important matter * * * , had the parties intended its inclusion, would not have been left to implication or interpretation. It would have been made the subject of specific provision. The terms letter seems clear and unambiguous. To hold as respondent suggests, would extend the effect of the agreement far beyond its apparent scope. [*Denver & Salt Lake Railway Co. v. Commissioner, supra* at 717.]

This Court, in its subsequent consideration of the matter in *Denver & Rio Grande Western Railroad*, did no more than modify its view to the extent of accepting additional evidence in order to determine the meaning of an express condition of the terms letter. This is not the situation herein where we face the threshold issue as to what should be considered as a condition of the terms letters. In the context of this case, we think that the foregoing quotation from *Denver & Salt Lake Railway* is clearly supportive of our conclusion herein. Finally, we observe that respondent seeks herein not only to persuade us to transmute a statement in Mimeo 58 into a condition of the terms letters but an *irrevocable* condition as well, irrespective of any change or clarification in the law. We are unwilling to make such a double jump and imprison petitioner in perpetuity,

particularly in light of the following provision of the terms letters in respect of the amounts of depreciation in the schedules set forth in those letters:

It is mutually understood that this is an agreement in principle and that a detailed investigation of the depreciation basis has not been made by the Bureau, and that the basis may be corrected to conform to the allowable basis under the Internal Revenue Code should investigation disclose errors of ·cost or valuation. * * * [Cf. *Chicago, Burlington & Quincy RR Co. v. United States, supra* at 1001.]

In view of the foregoing, we conclude that the Railroads, by accepting the terms letters, did not irrevocably agree to exclude amounts for interest and taxes during construction from the depreciable basis of the assets in question. If respondent had intended a contrary result, he should have made his intention clearer by setting out the exclusion of interest and taxes during construction as an express condition in the terms letters.[14]

We also reject respondent's argument that because petitioner excluded amounts attributable to interest and taxes during construction as part of its depreciable basis in schedules it submitted with respect to its election of certain treatment under section 94 of the Technical Amendments Act of 1958, Pub. L. 85-866, 72 Stat. 1606, or because petitioner did not claim deductions based on the inclusion of such amounts in its submitted returns over the years, petitioner is estopped[15] herein from doing so now. As we explained in *Sangers Home for Chronic Patients v. Commissioner*, 72 T.C. 105, 114 (1979),

The doctrine of equitable estoppel generally applies where the taxpayer makes a representation of fact on which the Commissioner relies to his detriment, and, through such reliance and his ignorance of the true facts, is induced not to correct the error before its correction is barred by the statute of limitations. * * * [Fn. ref. omitted.]

Respondent does not herein claim that he has been intentionally mislead or unfairly prejudiced by petitioner's delay

---

[14]As an example of the binding effect of an express condition in the terms letters, see *Chicago, Milwaukee, St. Paul & Pacific R. Co. v. United States*, 186 Ct. Cl. 250, 404 F.2d 960, 969-972 (1968), where the taxpayer was held to be bound by the *rates of depreciation* set forth in the terms letters.

[15]Our discussion of estoppel encompasses related considerations involved in equitable estoppel, quasi-estoppel, consistency, and laches. See *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 838 (1980).

in finally including amounts for interest and taxes in the basis for depreciation of its assets, nor that he has unjustly relied on petitioner's actions. Moreover, as we have previously noted (see p. 161 *supra*), the terms letters provided that "allowable basis" could be corrected, and it was in the context of this provision that the CB&Q case rejected a similar contention by respondent in respect of donated property. See 455 F.2d at 1001. We emphasize that we do not have before us the usual situation where the Government seeks to apply the doctrine of estoppel, namely, where the taxpayer has included an item in income which should properly have been included in income in an earlier year (now barred by the statute of limitations) or seeks a deduction which was taken in an earlier year (also so barred). in such situations, the potential for prejudice to respondent is clear. See *Crosley Corp. v. United States*, 229 F.2d 376 (6th Cir. 1956); *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. at 559-561, 838-840. What is involved here is the *failure of petitioner to take a deduction* to which it would have been entitled if it had increased its basis for depreciation by the amount of interest and taxes during construction. In fact, the revenue would thus appear to have benefited from the resulting increase in taxes paid, although we recognize that the precise effect on the overall revenue may depend upon the extent of the gain or loss on the disposition of the assets in question.

In *Southern Pacific Transportation Co. v. Commissioner*, *supra* at 840, we pointed out that the doctrine of "laches" is typically applied only where, "in the discretion of the court in light of the facts and circumstances of each case," it is determined that there existed—

(1) inexcusable delay (lack of diligence) in asserting a claim by the party against whom the doctrine is to be applied, and (2) prejudice to the party against whom the delayed claim is made (the party raising the defense of laches) caused by his reliance on his adversary's conduct. * * * [75 T.C. at 840.]

Unlike the situation which existed in *Southern Pacific*, in which the taxpayer sought to establish its basis in certain railroad property acquired prior to 1914 with "historical costs" rather than by the ICC estimates it had consistently

used on its returns, petitioner clearly has not compelled respondent—

to scrutinize materials which, owing to the passage of time, the lack of time, the deterioration of records, the murkiness of information relative to transactions and events which took place almost a century ago, and the death of crucial personnel, are extremely difficult, if not impossible, to verify. [75 T.C. at 841-842.]

To the contrary, in this case, the facts and figures relevant to petitioner's claims for additional depreciation deductions are as clear today as they were over 70 years ago, and are not disputed by respondent herein. The issue in dispute is a question of law, and respondent can as easily defend his position today as he could have when the terms letters were executed. Accordingly, while petitioner has delayed in claiming its deductions, such delay has not placed respondent at any disadvantage (compare *Southern Pacific Transportation Co. v. Commissioner, supra* at 842).

Under all the circumstances herein, we hold that petitioner's course of conduct over the years should not preclude it from now claiming deductions based upon the addition to the basis of depreciation of the assets in question of amounts representing interest and taxes during construction.

Finally, respondent argues that petitioner is collaterally estopped by our decision in *Chesapeake & Ohio Railroad Co. v. Commissioner*, 64 T.C. 352 (1975), from claiming increased depreciation deductions, with respect to C&O's railroad grading and tunnel bores, by adding to the basis of its assets any amounts attributable to interest and taxes during construction. In that case, we decided several issues concerning C&O's claims for depreciation deductions, with respect to its railroad grading and tunnel bores, for the 1954 through 1963 taxable years. Prior to trial, the parties disposed of several issues by means of a negotiated partial settlement, one of which was whether interest and taxes during construction should be included in the adjusted basis of these C&O assets. Respondent argues that, since C&O, as part of the pre-trial settlement, agreed not to include such amounts in its basis for depreciation, petitioner is now

precluded from litigating this issue. Respondent's argument misses the mark by a wide margin.

As the Supreme Court explained in *United States v. International Building Co.*, 345 U.S. 502, 505-506 (1953), when faced with a similar situation,

> We conclude that the decisions entered by the Tax Court for the [earlier taxable years] were only a *pro forma* acceptance by the Tax Court of an agreement between the parties to settle their controversy for reasons undisclosed. There is no showing either in the record or by extrinsic evidence (see *Russell v. Place*, 94 U.S. 606, 608) that the issues raised by the pleadings were submitted to the Tax Court for determination or determined by that court. They may or may not have been agreed upon by the parties. Perhaps, as the Court of Appeals inferred, the parties did agree on the basis for depreciation. Perhaps the settlement was made for a different reason, for some exigency arising out of the bankruptcy proceeding. As the case reaches us, we are unable to tell whether the agreement of the parties was based on the merits or on some collateral consideration. Certainly the judgments entered are *res judicata* of the tax claims for the [earlier taxable years], whether or not the basis of the agreements on which they rest reached the merits. But unless we can say that they were an adjudication of the merits, the doctrine of estoppel by judgment would serve an unjust cause: it would become a device by which a decision not shown to be on the merits would forever foreclose inquiry into the merits. *Estoppel by judgment includes matters in a second proceeding which were actually presented and determined in an earlier suit.* See *Commissioner v. Sunnen, supra*, at 598. A judgment entered with the consent of the parties may involve a determination of questions of fact and law by the court. But unless a showing is made that that was the case, the judgment has no greater dignity, so far as collateral estoppel is concerned, than any judgment entered only as a compromise of the parties. [Emphasis added.]

The mere fact that the stipulated issue was related to an issue which was actually litigated does not require a different conclusion. *Food Machinery & Chemical Corp. v. United States*, 177 Ct. Cl. 219, 366 F.2d 1007, 1008 (1966). Accordingly, it is clear that the parties' negotiated settlement, with respect to the issue of the inclusion in basis of amounts attributable to interest and taxes during construction claimed in prior taxable years, in no way acts as a bar to the claims made by petitioner with respect to the taxable years herein at issue.

To reflect the foregoing and the agreements reached by the parties on other issues,[16]

*Decisions will be entered under Rule 155.*

---

[16]We note that respondent, on brief, states that "the parties are in agreement that any amount for interest and taxes actually paid and deducted by the petitioner in any return from March 1, 1913, through 1916 would not become part of basis in the asset." Petitioner, however, answers that it did not so stipulate, denies such an agreement exists between the parties, and further argues that, in any event, the treatment of the 1913-16 interest and taxes is not at issue herein. Review of the record reveals that the stipulation of agreed issues entered into by the parties makes no mention of such an offset, and it is clear that pursuant to the stipulation of facts, respondent agreed, in the event we found for petitioner on the interest and taxes issue, to be bound by the amounts therein listed as the proper allowances for depreciation in each year at issue. We should add that we have no way of determining whether the 1913 to 1916 amounts are in fact excluded from the *stipulated* amounts of basis to be used if we decide the interest and taxes during construction issue for petitioner. If they are, petitioner is bound as respondent claims.